656 N.E.2d 824 (1995)
Paul Ed STONE and Sally Stone, Appellants-Respondents,
v.
THE DAVIESS COUNTY DIVISION OF CHILDREN AND FAMILY SERVICES, Appellee-Petitioner.
No. 14A01-9410-JV-324.
Court of Appeals of Indiana.
October 17, 1995.
Transfer Denied February 5, 1996.
*826 Joe D. Black, Ramsey & Black, Vincennes, Dean Sobecki, Washington, for appellants.
Tim J. Dant, Hayes, Dant and Steiner, Washington, for appellee.
Robert Leonard, Washington, Guardian ad litem.

OPINION
NAJAM, Judge.

STATEMENT OF THE CASE
Paul Ed Stone ("Father") and Sally Stone ("Mother") appeal from the trial court's order terminating their parental rights with respect to their five children.[1] The Daviess County Division of Children and Family Services (DCFS) filed a petition to terminate the parental rights of both parents due to inadequacies in the care being provided to the children. Both Father and Mother are persons of limited intelligence and have other mental or cognitive deficiencies. Following trial, the court held that termination of parental rights was in the best interests of the children.
We affirm.

ISSUES
Both Father and Mother present issues for our review, which we restate as follows:
1. Whether there was sufficient evidence to support the termination of Father's parental rights.
2. Whether the Americans with Disabilities Act requires that prior to termination of parental rights the DCFS must establish it has made reasonable accommodation in providing services for the special needs of disabled parents.
3. Whether the trial court erred when it admitted into evidence the testimony of a clinical social worker.
4. Whether the trial court erred when it declined to consider the wishes of one of the children concerning the termination of parental rights.

FACTS
Father and Mother were married on July 28, 1980. There were five children born of the marriage: Teresa, born in 1979, Paul, Jr., born in 1981, Daniel, born in 1983, and twins Terry and Jerry, born in 1984. The DCFS first became involved with the Stone family around 1984. On December 18, 1989, the DCFS filed a petition alleging that the Stone children were children in need of services ("CHINS"), and they were removed from the home. Mother and Father were separated when the children were removed and they eventually divorced.
The children were removed from the home pursuant to a CHINS petition for a variety of reasons. The daughter, Teresa, had reported an incident of sexual abuse by her paternal grandfather. The home was in poor condition and posed a health and safety risk to the children. The children were not receiving proper hygiene, medical care, supervision, or nutrition. None of the school-age children had been attending school regularly. *827 When the children did attend school, the parents had not been picking them up after school, and often would not be home to let the children in when they came home from school. The DCFS also believed that Father and Mother had been using excessive discipline with the children. Following the children's removal, the parents participated in DCFS provided services including parenting classes, homemaker services, visitation provisions, family counseling, and individual counseling.
Mother is mentally deficient with an I.Q. of 67, which places her in the lowest 3% of the population. She has other cognitive and personality deficiencies as well. She has a dependent personality, having no identity apart from other people. Although Mother was cooperative with the DCFS, the advice and counseling regarding parenting and psychological issues were beyond her level of understanding. Mother continues to deny that the children have been abused or neglected or that she has any parenting deficits.
Father has fewer limitations than Mother and has an I.Q. of 71, which places him in the lowest 10% of the population. Father admits that he has a temper and has disciplined the children with a belt. At the time of removal, Father believed that the children were developmentally normal and that it was appropriate to teach children to be mean because it is a mean world. Father is a hard worker and has cooperated with the DCFS by attending parenting classes and counseling. However, he has consistently denied that there had been any problems with raising the children, in maintaining a home suitable for children, or that he had any parenting deficits. Over the years during which the DCFS provided services, Father made little progress toward overcoming his deficiencies.
All five children were badly harmed, emotionally and psychologically, while in the custody of Father and Mother. The children currently live in four separate foster homes, with the twins residing together. Teresa resists visitations with her parents and is in favor of the termination of parental rights. Paul, Jr., age thirteen, was academically and socially delayed in the custody of his parents and is extremely angry and abusive. He has bonded with his foster parents and wants to live with them. The second oldest boy, Daniel, is very aggressive and regresses easily. He is unresponsive to discipline during visitation with Father. The twins, almost ten years old, were the most damaged in the custody of their parents. When placed in foster care they displayed wild, untrained behavior consisting of kicking, biting and screaming. The boys would urinate in the corner of the house as if not potty trained. They each have respiratory disorders, attention deficit disorders, and are on medication.
During the four years following removal of the children, the juvenile court conducted several review hearings. Also during that period, on February 18, 1992, the DCFS filed a petition to terminate the parental rights of both Father and Mother. Trial was held on three separate days, and on June 19, 1994, the trial court entered its findings and termination order. The DCFS plans to put the children up for adoption or, if adoption is not possible, to continue the children in foster care.

DISCUSSION AND DECISION

Issue One: Sufficiency of the Evidence
Father contends the evidence was insufficient to support the trial court's termination of his parental rights. Specifically, Father contends the trial court's order terminating his parental rights must be reversed because the DCFS failed to establish, by clear and convincing evidence, the statutory elements required for termination of the parent-child relationship. We cannot agree.
When reviewing an order terminating parental rights, we will neither reweigh the evidence nor judge the credibility of witnesses. Page v. Greene County Dept. of Welfare (1991), Ind. App., 564 N.E.2d 956, 959. Rather, we only consider the evidence most favorable to the court's decision and the reasonable inferences to be drawn therefrom. Id. We will not set aside the findings and judgment of the trial court unless clearly erroneous. Matter of Y.D.R. (1991), Ind. App., 567 N.E.2d 872, 876.
*828 A parent's right to establish a home and raise his children is protected by the Fourteenth Amendment to the United States Constitution. Matter of Adoption of D.V.H. (1992), Ind. App., 604 N.E.2d 634, 636, trans. denied. "However, these parental interests are not absolute and must be subordinated to the child's interest in determining the appropriate disposition of a petition to terminate parental rights." Shaw v. Shelby County Dept. of Public Welfare (1992), Ind. App., 584 N.E.2d 595, 601. The involuntary termination of parental rights is the most severe action a juvenile court can take. In re Matter of Robinson (1989), Ind., 538 N.E.2d 1385, 1388 (dissenting opinion of J. Dickson and J. DeBruler). Therefore, termination is designated to be a last resort, available only when all other reasonable efforts have failed. Id.
Indiana Code § 31-6-5-4(c) provides the exclusive means to effect the involuntary termination of a parent-child relationship. That statute requires the DCFS to prove by "clear and convincing evidence" that:
(1) the child has been removed from the parent for at least six (6) months under a dispositional decree;
(2) there is a reasonable probability that:
(A) the conditions that resulted in the child's removal will not be remedied; or
(B) the continuation of the parent-child relationship poses a threat to the well-being of the child;
(3) termination is in the best interests of the child; and
(4) there is a satisfactory plan for the care and treatment of the child.
IND. CODE § 31-6-5-4(c); Matter of Tucker (1991), Ind. App., 578 N.E.2d 774, 776, trans. denied. The trial court should judge a parent's fitness as of the time of the termination hearing and take into consideration evidence of changed conditions. Matter of Adoption of D.V.H., 604 N.E.2d at 637. Further, "the parent's habitual patterns of conduct must be evaluated to determine whether there is a substantial probability of future neglect or deprivation." Id. The trial court need not wait until the children are irreversibly influenced by their deficient lifestyle such that their physical, mental and social growth is permanently impaired before terminating the parent-child relationship. J.K.C. v. Fountain County Department of Public Welfare (1984), Ind. App., 470 N.E.2d 88, 93.
The trial court entered specific findings with respect to all of the elements of Indiana Code § 31-6-5-4. Father contends the DCFS failed to prove, by clear and convincing evidence, that (1) the conditions resulting in the children's removal from the home will not be remedied, (2) the continuation of the parent-child relationship poses a threat to the well-being of each child, (3) the termination is in the best interest of each child, and (4) the DCFS has a satisfactory plan for the care and treatment of each child.
The DCFS presented testimony from several experts who were of the opinion that Father was incapable of adequately parenting his children and that he had made little progress in correcting his problems. Clinical social worker Barbara Morgan testified that Father and Mother seemed to have no awareness that they lacked certain basic parenting skills and abilities. Morgan stated that "both [parents] have denied, pretty consistently, that they have any psychological problems." Record at 986. She testified that Father was raised in an abusive atmosphere and believed that discipline with a belt and hitting were acceptable. Father was not willing to question the propriety of his own upbringing or consider doing things differently. Morgan opined that if returned to the home, the children would be at a very high risk of regressing to their previous behaviors.
Caseworker Sarah Smith testified that throughout her supervision of the Stone CHINS case, Father and Mother continued to insist that there had never been a problem with their children and that they did not believe that anything needed to change in order to bring the children back into the home. Phyllis Burton, a homemaker with the DCFS, stated that with regard to Father's response to safety and cleanliness issues at the family residence, "there had not been much accomplished towards the home to make progress to bring the kids back into *829 it." Record at 821. When asked whether the DCFS counseling sessions had helped him to identify and remedy his psychological and emotional difficulties, Father testified "well, I ain't got very many." Record at 758. In addition, the DCFS presented ample testimony regarding the irreversible emotional and psychological harm suffered by the children while in the custody of Mother and Father.
We agree with the trial court's specific findings that the DCFS satisfied each element of Indiana Code § 31-6-5-4 by clear and convincing evidence. The evidence demonstrated that it is reasonably probable that Father will not remedy the conditions which resulted in the removal of his children and that the continuation of the parent-child relationship poses a threat to the well-being of each child. Further, the DCFS presented clear and convincing evidence, as set out in the FACTS section above, that each of the children suffered harm while in the custody of the parents such that termination is in the best interests of each child.
With regard to the DCFS plan for the future care of the children, we understand Father's concern that adoption of all five children by one family is unlikely and, thus, that the separation of the siblings in long term foster care may be the only alternative. Nevertheless, we cannot conclude that the DCFS plan is unsatisfactory. The best interests of the children dictate termination of parental rights. There was sufficient evidence to support the trial court's order.

Issue Two: Americans with Disabilities Act
Both Father and Mother contend that the Americans with Disabilities Act ("ADA") applies to proceedings for the termination of parental rights. Specifically, Father and Mother assert that the termination of their parental rights must be reversed because the DCFS discriminated against them in violation of the ADA in its failure to reasonably accommodate their mental deficiencies by providing services designed for their special needs. Again, we disagree.
Congress enacted the ADA to eliminate discrimination and to create causes of action for qualified people who have faced discrimination. See 42 U.S.C. § 12101(b). The ADA provides in pertinent part:
[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.
42 U.S.C. § 12132. The ADA requires that the public entity make "reasonable accommodation" to allow the disabled person to receive the services or to participate in the public entity's programs. 28 C.F.R. § 35.130(b)(7).
The question of whether the ADA applies to proceedings for the termination of parental rights is an issue of first impression in Indiana. This case also implicates the broader question of the relationship between the ADA and state substantive law. A few states have already considered whether the ADA has any impact on their state statutory requirements for the termination of parental rights. Some courts have simply held on the facts that the state agency had met its obligation under the ADA to reasonably accommodate mentally deficient parents by providing services designed to meet their special needs. See In re Welfare of A.J.R. (1995), 78 Wash. App. 222, 896 P.2d 1298, 1302; In re Angel B. (1995), Me., 659 A.2d 277, 279; In Interest of C.M. (1994), Iowa Ct. App., 526 N.W.2d 562, 566.
In the case of In the Interest of Torrance P. (1994), 187 Wis.2d 10, 522 N.W.2d 243, the Wisconsin Court of Appeals addressed congressional intent concerning the relationship between the ADA and state substantive law. The Torrance court determined that whether the public agency had reasonably accommodated the parent's disability in its provision of services is a separate inquiry under the ADA and not to be considered during termination proceedings. Id., 522 N.W.2d at 246. The Wisconsin termination of parental rights statute specifically requires that the county agency demonstrate that it has made diligent effort to provide services ordered by the court. Id., 522 N.W.2d at 245. The Torrance court reasoned that Congress, in enacting the ADA, did not intend to change the obligations imposed by unrelated statutes and, thus, that the ADA had no impact upon the operation of the Wisconsin termination statute. Id., 522 N.W.2d at 246.
Under the Supremacy Clause, state law that conflicts with federal law is without effect. U.S. CONST. Art. 6, cl. 2. The question of whether a federal statute preempts state law under the Supremacy Clause is essentially a question of congressional intent. California Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613, 623 (1987). The ADA is a civil rights statute enacted to assure nondiscriminatory access to public services for persons with disabilities, but the ADA was not intended ipso facto to re-write state substantive law. Unlike the Wisconsin scheme, our termination of parental rights statute neither conflicts with the ADA's requirement of reasonable accommodation in the provision of services, nor does it even address the provision of services. Our supreme court has held that the Indiana termination of parental rights statute does not require the agency to prove that any services have been offered to the parent to assist in fulfilling parental obligations. S.E.S. v. Grant County Department of Welfare (1992), Ind., 594 N.E.2d 447, 448. Thus, the reasoning in Torrance that Congress did not intend to change the substantive *830 obligations imposed by unrelated state statutes is even more appropriate when applied to Indiana's termination statute in that, under Indiana law, even a complete failure to provide services cannot serve as a basis to attack the termination of parental rights. See id.
Indeed, in the instant case, the services the DCFS provided to Father and Mother were provided in connection with the CHINS proceedings and not in connection with or as a prerequisite to the termination proceedings. We emphasize that the remedy Father and Mother seek for the DCFS's alleged failure in its provision of services is reversal of the trial court's termination of their parental rights. If our termination statute required that services be provided to all parents prior to the termination of parental rights, under the doctrine of preemption an ADA violation by the DCFS in fulfilling that statutory duty would provide grounds for attacking a termination pursuant to that statute. Such services, however, are not required in Indiana. Therefore, we hold that Father and Mother's discrimination claim cannot serve as a basis to attack the termination order itself.
Aside from the operation of our termination statute, once the agency opts to provide services during the CHINS proceedings to assist parents in improving parental skills, the provision of those services must be in compliance with the ADA. Implicit in the purpose of the ADA is the prohibition of discrimination by a public agency in its provision of those services to "qualified individuals with a disability." See 42 U.S.C. § 12132. Still, as we have noted above, any alleged noncompliance with the ADA by the DCFS in the provision of services in the CHINS proceedings would be a matter separate and distinct from the operation of our termination statute. See State Ex. Rel. Gosnell v. Cass Cir. Court (1991), Ind., 577 N.E.2d 957, 958.
Even if Father and Mother could bring their discrimination claim during the termination proceedings, the intent of the ADA is merely to ensure that disabled individuals are not denied the benefits of services provided by the public entity.[2] The parents contend that the DCFS had a duty to determine what the ADA requires and to establish procedures to meet the special needs of disadvantaged parents. However, all that is required is that in providing services in the CHINS proceeding, the DCFS must reasonably accommodate a parent's disability, which is what occurred in the instant case.
The record shows that in the CHINS proceedings, the DCFS provided both parents with extensive professional services on an individual basis in an attempt to help the parents overcome their parenting deficiencies. While Father and Mother contend that the DCFS provided essentially the same services as it would have provided to non-disabled parents, the record does not support *831 that contention. Homemaker Burton testified that she was aware of Mother's cognitive limitations and that her services were specifically tailored to Mother's special needs. For example, Burton used charts and pictures to help Mother understand the nutritional needs of the children. Record at 813-14. During parenting classes, instructors showed videos and read the materials to Mother and Father due to their inability to read and understand the written information. Record at 842-44. The DCFS administered a parenting skills inventory to Father and Mother which showed that both parents had the aptitude to utilize parenting skills. Expert testimony further established that there is no necessary correlation between a low I.Q. and the ability to parent. Record at 257, 290. However, the record indicates that the most significant factor in the parents' failure to meet their parental obligations was their continued denial that there had ever been any inadequacy in the care of their children. The parents have not suggested, nor can we envision, how the DCFS could reasonably have designed its services even more closely to accommodate their particular disabilities. On this record, we cannot conclude that the DCFS discriminated against Father and Mother in violation of the ADA.
As we stated earlier, parents have a Fourteenth Amendment right to establish a home and raise their children. Matter of Adoption of D.V.H., 604 N.E.2d at 636. This constitutional protection may be overcome and parental rights terminated when the requirements of Indiana Code § 31-6-5-4 are met. See Tucker, 578 N.E.2d at 778, 780. Every child is entitled to a minimum level of care regardless of the special needs or limited abilities of its parents. In the final analysis, the rights of the parents under the Fourteenth Amendment and the ADA must be subordinated to the protected rights of the children. See Wisconsin v. Yoder, 406 U.S. 205, 233-34, 92 S.Ct. 1526, 1542, 32 L.Ed.2d 15, 35 (1971) (parents' constitutional rights may be overcome if health or safety of child is in jeopardy). We are satisfied that additional services would not have cured the parents' denial or chronic parenting deficiencies, or have enabled the parents to maintain a home which met the essential needs of these children.
Consistent with the ADA, Indiana law provides that parental rights may not be terminated solely on the basis of mental disability. See R.M. v. Tippecanoe County DPW (1991), Ind. App., 582 N.E.2d 417, 420. Rather, mental disability is merely a factor to be considered along with other pertinent evidence bearing upon the question of a parent's fitness. Id. Here, the termination of parental rights was not based solely on the mental disabilities of the parents. The DCFS presented clear and convincing evidence that the conditions that resulted in the children's removal from the home remained unchanged and that termination of parental rights was in the best interests of the children. We find no reversible error.

Issue Three: Social Worker's Testimony
Father asserts the trial court erred when it admitted the testimony of clinical social worker, Barbara Morgan, regarding the counseling and treatment of Father. We cannot agree.
Indiana Code § 25-23.6-6-1 provides that, subject to certain exceptions, social worker-patient communications are privileged. However, privileged communications have been abrogated under Indiana Law in certain circumstances. For example, the physician-patient privilege has been abrogated by statute in proceedings for the involuntary termination of the parent-child relationship. IND. CODE §§ 31-6-5-1; 31-6-7; XX-X-X-XX(d); Shaw, 612 N.E.2d at 558. It is inconceivable that our legislature intended to abrogate the physician-patient privilege in termination proceedings but did not also intend to abrogate the social worker-patient privilege in those same proceedings. Accordingly, we hold that Indiana Code § 25-23.6-6-1(8) operates in conjunction with the other statutes cited above to abrogate the social worker-patient privilege in termination proceedings. The trial court did not err when it admitted Morgan's testimony.

Issue Four: The Wishes of One of the Children
Finally, Father contends the trial court erred when it terminated his parental rights *832 against the wishes of thirteen year-old Paul, Jr. Father asserts that termination of the parent-child relationship against the child's wishes invalidated the trial court's order. We cannot agree.
Father has presented no authority, nor are we aware of any, that requires that a child consent to the termination of a parent-child relationship. Analogizing the determination of child custody in dissolution proceedings, the wishes of the child is merely one of six factors enumerated by statute that the trial court must consider in effecting a custody order in the best interests of the child. IND. CODE § 31-1-11.5-21(a). We conclude that in termination proceedings, as in custody cases, the wishes of the child is only one of the many factors the trial court must consider in determining and effecting the best interests of the child.
In the present case, Paul, Jr., testified in a deposition that he did not wish that the parent-child relationship be terminated. This deposition was taken when he was eleven years-old in response to questions posed by parents' counsel in the presence of both Father and Mother. At trial, the court specifically found that Paul, Jr., had no bond of any consequence with either parent. The court also determined that Paul, Jr., had bonded with his foster parents and wanted to stay with them. Considering this evidence along with the circumstances under which the deposition testimony was elicited, the trial court could reasonably have decided to afford the evidence of the child's wishes little or no weight.
Further, two court-appointed special advocates and a guardian ad litem represented the children in this case. None of these representatives raised any issue regarding Paul, Jr.'s wishes regarding the termination of the parent-child relationship. It was the opinion of both special advocates that parental rights be terminated. The representation by the special advocates and the guardian ad litem was sufficient to protect the children's' rights. We cannot say that Paul, Jr.'s deposition testimony renders the trial court's judgment clearly erroneous. Therefore, we find no error.
The judgment of the trial court is affirmed.
SHARPNACK, C.J., and BARTEAU, J., concur.
NOTES
[1] We held oral argument at Vincennes University on September 20, 1995.
[2] Because we have concluded that the ADA does not apply to termination proceedings, we decline to determine whether either Mother or Father is a "qualified individual with a disability" entitled to protection by the ADA. See 42 U.S.C. § 12132.