# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 15 2016, 11:03 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael D. Gross
Lebanon, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| M.S.,<br>*Appellant-Defendant,*<br><br>v.<br><br>Indiana Department of Child Services,<br>*Appellee-Plaintiff.* | December 15, 2016<br><br>Court of Appeals Case No.<br>06A01-1606-JT-1260<br><br>Appeal from the Boone Circuit Court<br><br>The Honorable J. Jeffrey Edens, Judge<br><br>The Honorable Sally E. Berish, Magistrate<br><br>Trial Court Cause No.<br>06C01-1508-JT-285, 06C01-1508-JT-286 |

**Altice, Judge.**

## Case Summary

[1] M.S. (Mother) appeals the trial court's termination of her parental rights to A.R. and B.S. (collectively, the Children). In doing so, she does not directly challenge any of the trial court's findings of fact or conclusions. Mother acknowledges that she suffers from mental illness, which has resulted in her distrust of the Department of Child Services (DCS) and her refusal to cooperate with virtually all service providers. Her sole argument on appeal is that her parental rights were improperly terminated exclusively on the basis of her mental disability.

[2] We affirm.

## Facts & Procedural History

[3] B.S. was born to Mother in September 2012, and the two moved to Indiana in March 2014. On April 24, 2014, DCS received a report from the Lebanon Police Department that Mother was walking on the street in Lebanon with B.S. and appeared to be impaired. Rachel Mullins responded to the scene for DCS. B.S. had not eaten all day and Mother had no money, so the officers bought food for the child. B.S. also had a badly soiled diaper. Mother, who was approximately eight months pregnant at the time, had no way to transport herself and B.S. to a home in Thorntown, where they were staying with a

friend.[1] Mullins drove them to Thorntown, and a safety plan was developed for B.S.

[4] The following day, DCS received a report that Mother had left B.S. with the friend without indicating when she would return. The friend and police had been unsuccessful in contacting Mother. When Mullins was finally able to reach her, Mother refused to provide her whereabouts or indicate when she would return. Accordingly, Mullins detained B.S. and placed him in foster care, where he has remained. DCS has never been able to locate B.S.'s father.

[5] Mother gave birth to A.R. in Lebanon on May 11, 2014.[2] DCS detained A.R. because Mother was homeless and refused assistance in finding shelter upon discharge from the hospital. Following a detention hearing on May 14, however, A.R. was returned to Mother's care because Mother was living with another friend, Rhonda Wamsley. A safety plan was developed for A.R.'s care.

[6] Shortly thereafter, on May 28, 2014, Family Case Manager (FCM) Kristin Miller convened a Family Team Meeting (FTM) to create a safety plan for the return of B.S. to Mother's care. The meeting terminated unsuccessfully when Mother began yelling, screaming, and cursing. Mother returned to the DCS office on June 5, 2014, to confront FCM Miller. Mother was combative,

---

[1] Mother has no driver's license and no other means of transportation aside from relying on others. She walks most places.

[2] A.R.'s father lives in Mississippi. Although he appeared telephonically for the initial detention hearing, he has never been involved in A.R.'s life.

accusatory, and yelling. DCS staff eventually called law enforcement in order to force Mother to leave.

[7] On June 6, 2014, FCM Miller performed a home check. Mother was not present, and A.R. had been left in Wamsley's care. Wamsley expressed concerns regarding A.R.'s health and the care provided by Mother. A.R. had developed severe thrush and diaper rash. Later that day, FCM Miller held another FTM to discuss concerns about Mother's recent behavior and A.R.'s medical condition and to create a safety plan. Law enforcement was present at DCS's request. Mother was once again verbally combative and out of control, but she eventually signed the proposed safety plan. Mother indicated, however, that she was leaving Wamsley's home and refused to say where she was going. While still upset and agitated, Mother roughly pushed a bottle into A.R.'s mouth and caused the infant's head to hit the table. As a result of Mother's actions, DCS detained A.R. for a second and final time and placed her in foster care with B.S., where she remains today.

[8] A.R. and B.S. were adjudicated CHINS on November 3, 2014, and a dispositional order was entered a few weeks later. Among other things, Mother was ordered to maintain weekly contact with DCS, notify DCS of any changes in address, appear for all appointments with service providers, obtain and maintain suitable housing, engage in and cooperate with home-based counseling, undergo a parenting assessment and a psychological evaluation and follow all recommendations, attend to her own psychiatric needs, and attend all visits with the Children.

[9] Mother regularly failed to abide by the dispositional order. Along with periods of homelessness, Mother changed residences on a number of occasions and consistently refused to provide DCS with her current address, even when directed to do so by the trial court. Mother was uncooperative, abusive, and hostile with her various FCMs. At the termination hearing, Mother openly acknowledged that she never attempted to work with the FCMs because she did not "really see eye to eye with them." *Transcript* at 308. Accordingly, she made little to no progress in services and flatly refused certain services. During initial assessments and evaluations with various providers, Mother refused to answer many necessary questions and was generally uncooperative, angry, and paranoid.

[10] Mother was diagnosed with generalized anxiety disorder, major depression, PTSD, and personality disorder not otherwise specified. Individual therapy sessions began in June 2014 with Jane Roell of Cummins Behavioral Health (Cummins). The sessions proved unproductive due to Mother's attitude and refusal to provide information. Mother also missed most scheduled sessions. In November 2014, Mother's therapy was reassigned to Vanessa Enos, but Mother did not re-engage in individual therapy until January 2015. Mother again made no progress and was combative, insulting, and defiant in her therapeutic sessions with Enos. Mother had to be escorted from Cummins by law enforcement on two occasions.

[11] Cummins attempted to provide other needed services to Mother to no avail. Mother refused home-based therapy, believing she did not need it. Further,

although she attended two life-skills sessions, both were terminated early due to Mother's yelling and disrespect. With the exception of supervised visitation, Mother was unsuccessfully discharged from services with Cummins in March 2015. She met none of her therapeutic goals during her time with Cummins and failed to acquire the skills needed to properly parent the Children.

[12] Mother went to her third therapist – Angela Magana with Aspire – between April and June 2015. Mother exhibited hostility and lack of trust throughout the four sessions that she attended with Magana. No progress resulted from these sessions, and Mother was discharged due to lack of cooperation and verbal abuse of her therapist.

[13] In July 2015, Mother re-engaged with a new therapist, Keith Seegers with Aspire. Mother attended approximately eight group therapy sessions by December 2015 and did well. During this time, she also attended five or six individual sessions with Seegers, missing six other scheduled appointments. Mother behaved a bit better with Seegers but overall she made no noticeable progress in individual therapy. By January 2016, Seegers continued to have concerns about Mother's parenting ability based on her refusal to interact appropriately with those trying to help her and her refusal to reach out to others for assistance.

[14] Mother was referred for supervised visitation with the Children throughout the case. Visitation generally went well for a period of time but Mother eventually began to struggle with inappropriate verbal aggression toward service providers

in front of the Children.  In June 2015, Mother refused any further visitation supervised by Cummins.  She exercised no visitation with the Children from May 22 through July 30, 2015.  Thereafter, she re-engaged with visitation services through Cummins.  In August 2015, Mother terminated visitation with A.R.[3] because A.R. cried inconsolably during visits.  She also inquired of the foster mother whether she would be willing to adopt A.R.  Mother continued to sporadically visit with B.S. from September through December 2015.

[15]  Throughout the course of the CHINS proceedings, the trial court generally found after review hearings that Mother had, at best, minimally complied with the case plan, minimally enhanced her ability to fulfill her parental obligations, and minimally cooperated with DCS.  After the review hearing on August 17, 2015, the court found that Mother had not complied with the case plan, had not enhanced her ability to fulfill her parental obligations, and was minimally visiting the Children.  Accordingly, the court changed the permanency plan to concurrent plans of reunification and adoption.  Following the next review hearing on October 19, 2015, the court changed the plan to adoption.

[16]  In the meantime, DCS filed the instant termination petitions on August 10, 2015.  The trial court held hearings regarding the petitions on January 7, 8, and 25, 2016, as well as February 1, March 4, and March 11, 2016.  During her

---

[3] Mother admittedly has no bond with A.R.  She testified at the termination hearing that A.R. would be better off with her foster family.  Mother indicated, however, that she still wanted A.R. and B.S. back in her care and custody.

testimony on January 25, Mother refused to answer certain questions and then stormed out of the courtroom despite the court's warning that she would be arrested for direct contempt of court. At the hearing on February 1, Mother presented the court with her signed consents for the adoption of the Children. She revoked the consents in writing on February 29, 2016. The court issued its orders terminating Mother's parental rights to B.S. and A.R. on May 4, 2016.[4] Mother now appeals. Additional information will be provided below as needed.

## Discussion & Decision

[17] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.,* 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied.* Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

[18] The trial court entered findings in its order terminating Mother's parental rights. When the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cty. Office of Family &*

---

[4] The rights of A.R. and B.S.'s respective fathers was also terminated. The fathers do not appeal.

*Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

[19] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.,* 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.,* 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[20] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for

placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D).

[21] In this case, Mother does not specifically challenge any of the trial court's findings or conclusions. To the extent she argues that the trial court's findings or conclusions are clearly erroneous, Mother has waived this issue by failing to make a cogent argument. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (citing Ind. Appellate Rule 46(A)(8)(a)).

[22] Mother's entire, and rather brief, argument is that she is under a severe mental disability, and Indiana law provides that her parental rights may not be terminated solely on the basis of mental disability. Indeed, mental disability is just one factor to be considered along with other pertinent evidence bearing upon the question of a parent's fitness. *Stone v. Daviess Cty. Div. of Children & Family Servs.*, 656 N.E.2d 824, 831 (Ind. Ct. App. 1995), *trans. denied*. While it is clear that Mother has some mental health issues, the trial court did not terminate her rights based upon her mental illness. Rather, in concluding that

there existed a reasonable probability the conditions that resulted in the Children's removal or continued placement in foster care would not be remedied, the court explained:

> Mother remains without stable housing, lacks basic parenting skills, refuses to recognize and address her lack of interpersonal skills and the effect that has on the children, has been offered services and refused or failed to comply with the same, has failed to complete any [d]ispositional terms despite involvement with multiple agencies and service providers, has failed to consistently visit [B.S.] and has voluntarily had no contact with [A.R.] in months.

*Appendix* at 52. In sum, after approximately two years of services provided to her by DCS and a multitude of different service providers, Mother remained either unable or unwilling to meet her parental responsibilities.

[23] The DCS presented clear and convincing evidence that the conditions that resulted in the Children's removal from and continued placement outside Mother's care remained unchanged and that termination of parental rights was in the best interests of the Children. The evidence also established a satisfactory plan for the Children's care and treatment following termination – adoption by the foster family with whom they have lived since June 2014. Mother has failed to establish reversible error.

[24] Judgment affirmed.

[25] Riley, J. and Crone, J., concur.