## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 24 2018, 7:02 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Leanna Weissmann
Lawrenceburg, Indiana

Jennifer A. Joas
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of:

A.S. (Minor Child)

And

C.S. (Mother) and B.S. (Father),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

April 24, 2018

Court of Appeals Case No. 69A04-1712-JT-2905

Appeal from the Ripley Circuit Court

The Honorable Ryan King, Judge

Trial Court Cause No. 69C01-1705-JT-10

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellants-Respondents, B.S. (Father) and C.S. (Mother) (collectively, Parents), appeal the termination of their parental rights to their minor child, A.S. (Child).

We affirm.

## ISSUE

Parents raise one issue on appeal, which we restate as: Whether the Indiana Department of Child Services (DCS) presented clear and convincing evidence to support the termination of Parents' parental rights.

## FACTS AND PROCEDURAL HISTORY

Father and Mother are the biological parents of the Child, born January 27, 2014. At the time the Child was born, Parents were married. Mother also has an older child, J.S. from a previous relationship.[1] On December 3, 2014, the Ripley County office of DCS received a report alleging neglect, and possible abuse, of the Child and J.S. Specifically, it was reported that the ten-month-old Child "was malnourished and had dark circles under her eyes," and the reporting source indicated that in the previous month J.S. had been observed

---

[1] J.S. is not a subject of this appeal.

with bruises and a black eye. (DCS Exh. 1). It was further alleged that Parents were using drugs in the home. That day, DCS conducted a home visit. DCS observed no marks on the Child or J.S., and Parents explained that the Child had recently been hospitalized and had seen a doctor that morning. Parents submitted to a drug screen and admitted to smoking marijuana. At that time, DCS worked with Parents to establish a safety plan, pursuant to which Parents agreed to not use drugs in their apartment or care for the children while under the influence of drugs.

[5] Two weeks later, DCS obtained information from the Child's doctor indicating concerns over the Child's weight loss. The doctor questioned Mother's ability to care for the Child without assistance based on Mother's apparent inability "to recognize the importance of regular feedings." (DCS Exh. 1). The doctor opined that Parents' report of the Child's food consumption did not align with her physical condition. On January 9, 2015, DCS filed a request for approval for a Program of Informal Adjustment. The trial court approved the Informal Adjustment on January 12, 2015, at which time it was noted that the Child and J.S. "are at imminent risk of removal from the home environment and absent effective preventative services, [DCS] will petition the court to place the [children] in foster care." (DCS Exh. 1). During the Informal Adjustment, it became apparent to DCS and service providers that both Father and Mother suffer from some type of intellectual disability. Nevertheless, Parents substantially complied with the program, and on June 6, 2015, DCS moved to

discharge the Informal Adjustment, which the trial court approved on July 12, 2015.

[6] Four months later, on November 7, 2015, DCS was notified that Parents were again using drugs. Mother admitted to smoking marijuana. A safety plan was implemented, but on November 12, 2015, Mother submitted a positive drug screen for marijuana. On December 11, 2015, Mother again admitted that she had smoked marijuana. Both Parents subsequently submitted positive drug screens and also refused to submit to drug screens when requested to do so. Thus, on December 22, 2015, DCS filed a petition alleging that the Child and J.S. were each a child in need of services (CHINS). As to the Child, the CHINS petition asserted that her "physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of [C]hild's [Parents] . . . to supply [C]hild with necessary food, clothing, shelter, medical care, education or supervision." (DCS Exh. 2). On January 6, 2016, the trial court held an initial hearing and ordered Parents to submit to all drug screens as requested by DCS, the refusal of which would warrant DCS's detainment of the Child.

[7] Despite DCS's attempts to "warn" Parents, they failed to "grasp[] the concept that marijuana use in the home with the children was a safety risk." (Tr. Vol. II, p. 34). On February 1, 2016, the trial court held a detention hearing and granted DCS's request to remove the Child from Parents' home due to ongoing drug use. At the DCS office, while considering where to place the Child, the DCS caseworker observed that the Child just "walked in circles . . . around the

whole office for hours" and "she would look straight through you." (Tr. Vol. II, pp. 25-26). The Child was also found to be infested with lice and had to be treated prior to being placed. The Child was subsequently placed in foster care. J.S. was also removed and placed in the same foster home.

[8] When the Child arrived at her foster home, she "was very, very skinny, . . . much smaller than an average two year old is." (Tr. Vol. II, p. 148). She was pale and had "very sunken skin." (Tr. Vol. II, p. 158). The Child was "very sensitive to any lights or sounds," and certain noises were "very terrifying to her." (Tr. Vol. II, pp. 148-49). She lacked confidence and walked with the skill level of a one-year-old who would have "just started walking. She did not like shoes, couldn't walk in them well." (Tr. Vol. II, p. 149). The Child "didn't know how to eat food" and "didn't know how to drink out of a cup." (Tr. Vol. II, p. 149). Furthermore, the Child was non-verbal, "gave blank stares," and did not recognize her own name. (Tr. Vol. II, p. 151). The Child would sleep through the night and then, instead of alerting her foster parents when she awoke, she would just lie silently in her crib. Essentially, the Child was "[v]ery much delayed." (Tr. Vol. II, p. 149). Under her foster parents' care, the Child immediately commenced regular therapy and quickly demonstrated substantial progress with her muscle tone, speech, and vocabulary. In October of 2016, the Child was examined at Peyton Manning Children's Hospital. Although she had previously been deemed as "failure to thrive," the Child's drastic improvement during the six months she had been in foster care established that her failure to thrive was the result of her prior home environment and lack of

adequate nutrition. (Tr. Vol. II, p. 153). In December of 2016, the foster parents had the Child tested to determine whether she would need a special education preschool program, but the Child was instead found to be average/above average for her age. The Child is bonded with her foster parents, and they intend to adopt her.

[9] On March 14, 2016, the trial court held a fact-finding hearing during which Parents admitted to the allegations contained in the CHINS petition, and on March 17, 2016, the trial court adjudicated the Child to be a CHINS. On April 14, 2016, subsequent to a hearing, the trial court issued a Dispositional Order, granting wardship of the Child to DCS. The trial court additionally ordered Parents to participate in services designed to facilitate reunification. In relevant part, the trial court directed Parents to participate in any programs recommended by DCS or other service providers; maintain suitable housing; refrain from illegal drug use; engage in home-based counseling; complete a substance abuse assessment and follow all treatment recommendations; submit to random drug screens; meet the Child's medical and mental health needs; and attend visits with the Child. The trial court further ordered Mother to undergo a psychological evaluation.

[10] In substantial part, Parents participated with their case plan. Within two months of the Dispositional Order, Parents achieved sobriety and maintained it for the remainder of the case. They attended substance abuse counseling and drug education classes, and they worked with a home-based caseworker. Both Parents also completed psychological evaluations. Parents attended the

majority of their supervised visits, with the exception of several weeks when Mother had a lice outbreak and during instances of inclement weather as Parents lacked their own transportation.

[11] Despite Parents' apparent effort to comply with DCS's case plan, DCS and the service providers maintained significant concerns about Parents' ability to safely parent the Child and J.S. without DCS intervention. In fact, visits never transitioned from fully supervised because Parents had to be prompted regarding the same basic parenting tasks at every visit. The visit provider "had to make sure that everything was very structured, . . . to the point that everything had to be . . . repeated every visit. We had to make sure that they knew exactly what to do from the beginning to the end." (Tr. Vol. II, p. 119). The visit provider additionally had to ensure that Parents "brought the appropriate food, . . . that their discipline[e] was accurate . . . for both age levels, . . . and that they . . . properly played with the girls in a way that was appropriate for both age levels." (Tr. Vol. II, p. 119).

[12] More specifically, Parents struggled with their personal hygiene, which triggered concerns about ignoring the Child's hygienic needs and health as well. DCS also cited that Parents consistently had to be reminded to bring nutritious foods to visits and to monitor that the Child was actually eating. Given the Child's prior malnourishment, DCS heavily focused on this issue, but Parents seemingly failed to grasp the importance of the Child's diet. Parents were able to follow service providers' very specific directions, but they could not independently anticipate and provide for the Child's needs at visits. To

illustrate, it was suggested that Parents bring more vegetables, instead of cookies and candy, to the visits; at the next visit, Parents arrived with a vegetable tray but brought nothing else for the Child's meal. Parents also had to be repeatedly coached at each visit as to proper discipline techniques. It was noted that Mother lacked empathy toward the Child, and Father was observed to get frustrated and give up in difficult parenting situations. If the Child was crying during a visit, the visitation supervisor would have to encourage Father to console the Child and coach him through it. When the Child squirmed during a diaper change, Father gave up. DCS also reported that Father could not be dissuaded from ideas that he believed to be true—*i.e.*, certain medical treatments—notwithstanding proof to the contrary. DCS feared "that he would apply that, anything that he may learn from somebody else and apply that in the care for [the Child] and it may not be true." (Tr. Vol. II, p. 108).

> A psychological evaluation of [Father] stated that due to his low cognitive scores and ongoing psychiatric issues, it is unlikely that he will ever be able to safely parent his [Child]. A psychological evaluation of [Mother] recommended that her parenting time be supervised until she could show improvement in her parenting issues, which she has failed to do.

(DCS Exh. 2).

[13] In approximately the fall of 2016, Parents were evicted from their apartment, and for the next year, they lived with either friends or relatives. Following their eviction, "that was pretty much [Father's] only goal, was to find . . . housing. . . . [O]ther providers got the impression that he thought if he got an apartment, he

would get the [Child] . . . , and . . . [the court-appointed special advocate (CASA)], providers, [and DCS] would just remind him that there were other expectations, he would still just focus on the housing." (Tr. Vol. II, p. 51). Parents also divorced at some point during the pendency of the CHINS action, although this seemed to ultimately have a positive effect on their independence. Furthermore, on September 29, 2016, Parents were arrested and each charged with one Count of unlawful sale or transfer of a precursor, a Level 6 felony, for purchasing pseudoephedrine on behalf of another to be used in the manufacture of methamphetamine. On March 7, 2017, Parents pled guilty to their respective charge and were both sentenced to 910 days of reporting probation.

[14] On May 10, 2017, DCS filed a petition to terminate Parents' parental rights to the Child. Father's application for disability benefits was approved, and around the fall of 2017, he obtained suitable housing. Mother's application for social security benefits was denied, and she remained both unemployed and homeless. However, both Parents continued to engage in visits with the Child and attend other services. On October 25, 2017, the trial court conducted a hearing on DCS's termination petition. On November 8, 2017, the trial court issued an Order on Involuntary Termination of the Parent-Child Relationship, granting DCS's request to terminate Parents' parental rights to the Child.

[15] Parents now appeal. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

Parents challenge the termination of their parental rights to the Child. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). However, parental rights "are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Id.* If "parents are unable or unwilling to meet their parental responsibilities," termination of parental rights is appropriate. *Id.* We recognize that the termination of a parent-child relationship is "an 'extreme measure' and should only be utilized as a 'last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed.'" *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015).

Indiana courts rely on a "deferential standard of review in cases concerning the termination of parental rights" due to the trial court's "unique position to assess the evidence." *In re A.K.*, 924 N.E.2d 212, 219 (Ind. Ct. App. 2010), *trans. dismissed*. Our court neither reweighs evidence nor assesses the credibility of witnesses. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We consider only the evidence and any reasonable inferences that

support the trial court's judgment, and we accord deference to the trial court's "opportunity to judge the credibility of the witnesses firsthand." *Id.* Where, as in this case, the trial court enters special findings of fact and conclusions thereon under Indiana Trial Rule 52(A), we evaluate whether the trial court's decision is clearly erroneous. *Id.* Under this standard, we must determine "whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment." *Id.* at 1230.

## II. *Termination of Parental Rights Statute*

[18] In order to terminate a parent's rights to his child, DCS must prove:

> (A) that one (1) of the following is true:
>
> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> * * * *
> (iii) The child has been removed from the parent and has been under the supervision of a local office . . . for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a [CHINS] . . . ;
>
> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS];

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each of the foregoing elements by clear and convincing evidence. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014). "[C]lear and convincing evidence requires the existence of a fact to 'be highly probable.'" *Id.* On appeal, Parents do not contest the trial court's findings that the Child has been removed from the home for the requisite period of time or that DCS has established a satisfactory plan for the Child's care and treatment.

A. *Threat to Child's Well-Being*[2]

Parents claim that there is insufficient evidence to support the trial court's determination that the continuation of the parent-child relationship poses a threat to the Child's well-being. It is well established that "[a] trial court must "judge a parent's fitness as of the time of the termination hearing and take into consideration evidence of changed conditions." *Stone v. Daviess Cnty. Div. of Children & Family Servs.*, 656 N.E.2d 824, 828 (Ind. Ct. App. 1995), *trans. denied.*

---

[2] Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive; therefore, DCS is required to prove only one of three listed elements. *See In re A.K.*, 924 N.E.2d at 220-21. In this case, the trial court based its termination decision on DCS's satisfaction of Indiana Code section 31-35-2-4(b)(2)(B)(ii)—that the continuation of the parent-child relationship poses a threat to the Child's well-being.

"[H]abitual patterns of conduct must be evaluated to determine whether there is a substantial probability of future neglect or deprivation." *Id.* A trial court "need not wait until the children are irreversibly influenced by their deficient lifestyle such that their physical, mental and social growth is permanently impaired before terminating the parent-child relationship." *Id.* Furthermore, "[c]lear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *K.T.K.*, 989 N.E.2d at 1230.

[20] The trial court found that

> [P]arents' lack of progress in services, their visitation remaining at fully supervised, and the [P]arents' inability to develop the necessary skills to care for their children, as well as [Mother's] lack of suitable or stable housing and her lack of stable income, support a finding that the continuation of the parent-child relationship poses a threat to the well-being of the [C]hild.

(Appellants' App. Vol. II, p. 32).

[21] Father contends that there is no evidence establishing that he was responsible for the Child's removal or that his parenting actions caused the Child's developmental delays. Father argues that the record establishes that he achieved stable housing and maintained sobriety as ordered. He suggests that his Level 6 felony conviction for the unlawful sale or transfer of precursors during the pendency of the case did not pose any threat to the Child. He further

asserts that the trial court improperly relied on the subjective opinions of service providers that he failed to make any progress during the eighteen months that he participated in services because there is no evidence that his parenting would endanger the Child. Similarly, Mother contends that DCS's reasons as to why the parent-child relationship poses a threat to the Child's well-being "were either flimsy or not supported by the [r]ecord." (Appellant-Mother's Br. p. 18). Mother contends that she "did what was asked of her. She became drug free and participated in visits and services," and there is no evidence that Mother harmed the Child or caused the Child's developmental delays. (Appellant-Mother's Br. p. 19).

[22] We find that DCS clearly established that Parents cannot independently act to ensure the Child's safety, and the trial court clearly accorded substantial weight to the concurring testimonies of DCS, the Child's CASA, the home-based caseworker, and the visitation supervisor that Parents are not capable of consistently providing full-time care for the Child in an unsupervised setting. The evidence reveals that Parents, to a limited extent, are able to follow specific directions when DCS is involved. However, as they demonstrated following the discharge of their Informal Adjustment, these Parents revert to their prior habits when left to their own devices. Parents stopped smoking marijuana for the duration of this case, but they did not consider the consequences—for either themselves or the Child—of providing pseudoephedrine to another individual for manufacturing methamphetamine. Furthermore, the Child was removed from the home in a malnourished state. It was due to the efforts of the foster

parents and DCS that the Child finally began to thrive during the pendency of this case. The Child's failure to thrive for the first two years of her life was the direct result of the environment she was subjected to in Parents' care and their failure to provide her with adequate nutrition. Parents' inability to recognize the severity of the Child's poor health while previously in their care, and their failure to prioritize the Child's nutritional needs during their supervised visits— even after consistent efforts by service providers reminding them to do so, is indicative of a future likelihood that the Child's health will be neglected if returned to Parents' care.

[23] Father obtained housing, and he improved his personal hygiene shortly before the termination hearing. Yet, he had to be prompted to console his crying Child, and he gave up when the Child resisted a diaper change. These are nominal parenting frustrations when compared to the challenges that he would be expected to face in the future without the assistance of service providers. Mother never obtained housing or employment, and despite her improvement in hygiene near the end of the case, DCS was validly concerned that Parents' neglect of their own hygiene would translate to a neglect of the Child's hygiene and other needs. Also, importantly, neither parent really seemed to be bonded with the Child. DCS maintained supervised visitation throughout the case because Parents established that they could not react to parenting situations without repeated prompting and coaching from the supervisor. *See Stone*, 656 N.E.2d at 828 (finding termination appropriate where DCS and other caseworkers opined, in part, that the parents were "incapable of adequately

parenting" the children as "little progress" was made to correct the problems throughout the case and the children "would be at a very high risk of regressing to their previous behaviors").

[24] The evidence establishes that Parents' failure to comprehend and implement parenting skills stems, at least in part, from their low-level intellectual functioning, but Parents correctly assert that mental limitations may not provide the sole basis for termination of parental rights. *See id.* at 831. However, an intellectual disability is a factor "to be considered along with other pertinent evidence bearing upon the question of a parent's fitness." *Id.* "Every child is entitled to a minimum level of care regardless of the special needs or limited abilities of . . . [the] parents." *Id.* at 828. In this case, DCS established that Parents would be unable to meet the Child's basic needs—physically and emotionally—if she were returned to their care. Parents' psychological evaluations indicated that they could not safely parent the Child.[3] Father points out that the home-based case manager testified that if Father had "an on-going mentor, he might do alright." (Tr. Vol. II, pp. 109-10). Parents must be able to meet their parental obligations independently of DCS intervention; it is not realistic to expect that DCS can provide a mentor to Father for the rest of the Child's minor years. Accordingly, we find that the evidence supports the trial

---

[3] Father argues that the psychological evaluation was not made part of the record; thus "we don't know how [the psychiatrist's] opinion was surmised." (Appellant-Father's Br. p. 22). However, through testimony and CHINS records, DCS admitted certain conclusions from the psychological report with no objection from either parent.

court's determination that the continuation of the parent-child relationship poses a threat to the Child's well-being.

## B. *Best Interests of the Child*

Parents also challenge the trial court's determination that termination of their parental rights is in the best interests of the Child. The parent-child relationship is "one of the most valued relationships in our culture." *Bester*, 839 N.E.2d at 147 (quoting *Neal v. DeKalb Cnty. Div of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). Thus, the purpose of terminating a parent-child relationship is to protect the child, not to punish the parent. *In re C.C.*, 788 N.E.2d 847, 855 (Ind. Ct. App. 2003), *trans. denied*. When considering whether termination would be in a child's best interests, the trial court must "look beyond the factors identified by [DCS] and . . . look to the totality of the evidence." *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. "The trial court need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship." *K.T.K.*, 989 N.E.2d at 1235. Permanency is a central consideration in determining a child's best interests. *Id.* "[T]he right of parents to raise their children should not be terminated solely because there is a better home available for the children." *In re K.S.*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001).

In concluding that termination would serve the Child's best interests, the trial court relied, in part, on Parents' failure to progress in services and their inability to safely parent the Child. The trial court also cited Mother's lack of housing

and income, as well as Parents' participation in a methamphetamine-related crime. In addition, the Child's CASA and service providers all recommended that the Child's best interests would be served by remaining with her foster parents. However, Parents again dispute the evidence establishing that they lack the ability to safely parent the Child, and they emphasize that they remedied the drug-use that initially resulted in the Child's removal. Parents also argue that they demonstrated their willingness and desire to work toward reunification throughout the case.

[27] It is well established that "[a] parent's historical inability to provide a suitable environment, along with the parent's current inability to do the same, supports finding termination of parental rights is in the best interests of the children." *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). Moreover, the testimony of the DCS caseworker and child advocates is sufficient to support the trial court's conclusion that termination is in the Child's best interests. *See McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). Here, DCS, the Child's CASA, the home-based caseworker, and the visitation supervisor all testified regarding their concerns about Parents' inability to take proper care of the Child. There is no dispute that Parents love the Child, and they endeavored to participate as directed. However, there was also evidence that Father would not "think that he would need help" on his own; Mother did not have housing or income, and she lacked empathy for the Child. (Tr. Vol. II, p. 110). The record establishes that the Child is not bonded with Parents but considers the foster parents to be her family. By the time of

the termination hearing, the Child had been removed from Parents' care for more than twenty months, during which time she thrived. Therefore, we find that there is ample evidence to support the trial court's determination that termination of Parents' parental rights is in the Child's best interests.

# CONCLUSION

[28] Based on the foregoing, we conclude that DCS presented clear and convincing evidence to support the trial court's order terminating Parents' parental rights to the Child.

[29] Affirmed.

[30] May, J. and Mathias, J. concur