

FILED

Jun 21 2016, 6:41 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven J. Halbert
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of N.C. (Minor Child) and A.C. (Father), <br><br> *Appellant-Respondent,* <br><br> v. <br><br> The Indiana Department of Child Services, <br><br> *Appellee-Petitioner* | June 21, 2016 <br><br> Court of Appeals Case No. 49A02-1510-JT-1711 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Marilyn A. Moores, Judge <br><br> The Honorable Larry E. Bradley, Magistrate. <br><br> Trial Court Cause No. 49D09-1405-JT-216 |

**Mathias, Judge.**

[1]     A.C. ("Father") appeals the involuntary termination of his parental rights to his minor son N.C. ("Child"). Father presents one issue, which we restate as

whether the American with Disabilities Act ("ADA") applies in termination proceedings.

[2] We affirm.

**Facts and Procedural History**

[3] Child was born on February 17, 1999 to Mother[1] and Father. On January 29, 2007, the Indiana Department of Child Services ("DCS") filed a petition alleging Child to be a child in need of services ("CHINS") after the health department condemned Mother's apartment. The petition alleged, "[t]he condition of the home was such that there was no eatable food in the residence, trash was overflowing, fecal matter was piled in the bathroom and the kitchen floor, the bath tub would not properly drain so no one in the household could use it, and the child's clothing and body were unclean." Ex. Vol., State's Ex. 2. Child was removed from the home and placed in foster care after Mother was admitted in a psychiatric facility for suicidal thoughts and Father could not be located.[2]

[4] A continued initial hearing was held on March 6, 2007, where Father admitted to the allegations in the CHINS petition and agreed to participate in a parenting assessment, a psychological evaluation, and a drug and alcohol assessment. On June 5, 2007, a CHINS review hearing was held and the court found that

---

[1] Mother signed a general consent for Child's adoption in 2008 and does not participate in this appeal.

[2] Father was incarcerated around the time of the dispositional hearing, but was released on June 3, 2007.

Father was not participating in services, so his visitation rights were suspended. Between June and September 2007, DCS family case manager Yoranda Caudill ("Caudill") worked with Father to explain the purpose of the assessments that the court ordered and to coordinate with Deaf Community Services to provide accommodations for him.[3] Father was also homeless at this time.

[5] On September 11, 2007, Father completed a psychological evaluation and was diagnosed with Depressive Disorder Not Otherwise Specified ("NOS"), Cognitive Disorder NOS, and Intermittent Explosive Disorder. Based on these diagnoses, DCS recommended supervised visitation, evaluation by a psychiatrist for psychotropic medication, individual counseling, and for Father to continue to follow the recommendations of the court. However, Father did not participate in counseling or any of the recommended services and did not complete the court-ordered parenting assessment[4] or drug and alcohol assessment. After the evaluation, DCS also noted concern with Father's cognitive ability, parenting capabilities, and mental heath.

[6] The trial court ordered the permanency plan to be changed to adoption on June 4, 2008. In September 2008, Father signed a specific consent for Child to be adopted by his foster parents.

---

[3] Father is deaf, and English is not his first language.

[4] The trial court's order indicates that Father partially completed the parenting assessment but did not have the communication and cognitive skills to fully complete it.

[7] After the foster parents reported some behavioral issues, Child was enrolled at Damar Services in a residential program in June 2010.[5] Child is diagnosed with autism spectrum, attention deficit and hyperactivity disorders and depression. While Child was enrolled at Damar, the foster parents decided that they no longer wanted to adopt him.

[8] Around the same time Child moved to Damar, Father contacted DCS and requested visitation with Child. The court granted supervised visitation based on the recommendation of the Child's therapist. On May 13, 2011, Father had a supervised visit with Child at Damar, but Father argued with staff and expressed concern that he was not able to visit Child alone. After that, Father participated in monthly supervised visits with Child that generally went well. However, Father still failed to participate in services and he did not attend any review hearings in the CHINS case between December 2008 and May 2015.

[9] Child transitioned from Damar into a new foster home in July 2012. Around the same time, the visits began confusing Child because Father made unrealistic promises, like taking Child on a trip to Washington D.C. DCS attempted to discuss Father's conduct and DCS's visitation expectations, but Father could not be reached at the time. Because of the new foster home placement, DCS notified and reminded Father that his visitation scheduled would change.

---

[5] Damar provides a variety of services to children and adults with developmental, behavioral challenges, and autism. Children come to Damar requiring different levels of care and safety, from high levels of supervision to less intensive support. Damar provides a full spectrum of innovative and individualized residential services. See http://www.damar.org/children-youth/residential-campus-services.

However, Father failed to attend the next visit with Child and another visit to celebrate Child's birthday on February 11, 2013. The visitation provider cancelled all future visitation due to Father's missed visits. DCS then referred Father to another visitation provider to reestablish supervised visitation.

[10]    At a visit on July 1, 2013, Father promised Child that he would live with him. The visit facilitator reminded Father not to make statements like that, and Father became "very hostile and angry." Ex. Vol., p. 244. During that same visit, Father expressed anger toward Child's foster mother and threatened that he was "coming to get her." *Id.* After this encounter, Child indicated that he no longer wanted to visit with Father because of Father's behavior and false promises. Father did not schedule any more visits with Child and had not seen Child for two years prior to the termination hearing.

[11]    DCS filed a petition to terminate Father's parental rights on May 19, 2014. After DCS filed the termination petition, the trial court ordered Father to participate in a mental status examination at the request of DCS. Although Father made several appointments for the exam, he never showed up, and as a result, the examiner would not make any future appointments. The trial court then held an evidentiary hearing on the termination petition on September 23, 2015. Child indicated that he is doing well in his current foster home, loves his foster mother, and wants her to adopt him.[6] Based on Child's diagnoses, Child's

---

[6] Child was sixteen years old at the time of the termination hearing.

therapist Henry Smith ("Smith") reported that he has special needs but also requires structure and stability. Over the past two years that Child has spent in his current placement, his behavior has stabilized and remained constant. Smith is concerned that if Child transitions into an unstable environment that the progress that Child has made will be disrupted. Child also has expressed a desire to go to college and Smith believes that if his environment changes that he might "give up on that." Tr. p. 111.

[12] Child's guardian ad litem Carolyn Thurston ("Thurston") agreed that he needs stability and adoption is in Child's best interests. Thurston further explained that Father has not completed services to effectively meet the needs of Child and Child's foster mother makes an active effort to meet Child's educational and emotional needs. Tr. p. 134

[13] On September 29, 2015, the trial court entered an order terminating Father's parental rights. Father now appeals.

## Discussion and Decision

[14] Father argues that because he is deaf and has cognitive and mental health problems that DCS was required to provide him accommodations under the ADA. He specifically contends that DCS's failure to accommodate his disability is a defense in this termination proceeding.

[15] Although Father makes this argument on appeal, after review of the record, we cannot agree that he raised this issue before the trial court. Father concedes that

he did not specifically mention the ADA issue during the termination hearing, but rather argues that Father's counsel repeatedly raised the failure of DCS to accommodate his disability.

[16] However, the record is devoid of such statements that Father alleges in his brief.[7] *See* Appellant's Br. at 16. Indiana Appellate Rule 46(A)(8)(a) provides:

> The argument must contain the contentions of the appellant on the issues present, supported by cogent reasoning. Each contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on.

A party waives an issue where the party fails to develop a cogent argument or provide adequate citation to authority and portions of the record. *York v. Frederic*, 947 N.E.2d 969, 979 (Ind. Ct. App. 2011), *trans. denied.* Further, a party may not raise an issue for the first time on appeal. *See In re K.S.*, 750 N.E.2d 832, 834 n.1 (Ind. Ct. App. 2001). Therefore, the issue is waived for failure to develop an argument supported by cogent reasoning and because it was raised for the first time on appeal.

---

[7] We recognize that during the termination hearing, Father complained of not being satisfied with the interpreters he was provided. See Tr. p. 74. When Father's counsel asked him if he had ever told anyone in juvenile court that he was having problems understanding because of the interpreter, Father responded, "The interpreter was, wasn't good, and then the next interpreter wasn't good. I don't know. The interpreter wasn't good so I, I got put in jail." Counsel repeated the question and Father again responded, "I, I, there were signing and I tried but no, I didn't, I just got put in jail and I was like okay, fine, I got put in jail." Based on Father's responses, it appears that he was dissatisfied with the interpreters provided during the course of his criminal proceeding, not the CHINS or termination proceeding.

[17] Father additionally argues that even if he waived DCS's alleged violation of the ADA on appeal, it constitutes fundamental error that deprived him of his constitutional right to parent under the Fourteenth Amendment of the United States Constitution. The fundamental error doctrine is a narrow exception to the waiver doctrine and applies to an "error that was so egregious and abhorrent to fundamental due process that the trial judge should or should not have acted, irrespective of the parties' failure to object or otherwise preserve the error for appeal." *In re G.P.*, 4 N.E.3d 1158, 1167 n. 8 (Ind. 2014). For our court to overturn a trial court ruling based on fundamental error, the error must have been "a clearly blatant violation of basic and elementary principles, *and* the harm or potential for harm therefrom must be substantial and appear clearly and prospectively. *S.M. v. Elkhart Cnty. Office of Family and Children*, 706 N.E.2d 596, 600 (Ind. Ct. App. 1999) (emphasis added).

[18] Here, Father misapplies the fundamental error doctrine by arguing that the error occurred when DCS failed to accommodate his disability under the ADA.[8] Moreover, it is well settled under *Stone* that the ADA does not apply in termination proceedings and Father was not denied services that accommodated his disability. *See Infra* at p. 9. DCS coordinated with Deaf Community Services to provide interpreters and family case manager Caudill set up a meeting to explain to Father the importance of completing the court

---

[8] Although Father argues fundamental error, his argument is more akin to a due process violation. See *In re G.P.*, 4 N.E.3d 1158, 1165 (Ind. 2014).

ordered services to meet Child's needs. Father still chose not to participate in the court-ordered and recommended services.

[19] Waiver notwithstanding, we address Father's argument that he should be entitled to use DCS's alleged failure to comply with the ADA as a defense to the termination of his parental rights. Congress enacted the ADA to eliminate discrimination and create causes of action for qualified people who have faced discrimination. *See* 42 U.S.C. § 12101(b). The ADA provides in relevant part:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. The ADA requires that the public entity make "reasonable accommodation" to allow the disabled person to receive the services or to participate in the public entity's programs. 28 C.F.R. § 35.130(b)(7).

[20] Our court was presented with whether the ADA applies in proceedings for the termination of parental rights in *Stone v. Daviess Cnty. Div. of Children and Family Servs.*, 656 N.E.2d 824 (Ind. Ct. App. 1995). In *Stone*, we held:

> the services the DCFS provided to Father and Mother were provided in connection with the CHINS proceedings and not in connection with or as a prerequisite to the termination proceedings. We emphasize that the remedy Father and Mother seek for the DCFS's alleged failure in its provision of services is reversal of the trial court's termination of their parental rights. If

our termination statute required that services be provided to all parents prior to the termination of parental rights, under the doctrine of preemption an ADA violation by the DCFS in fulfilling that statutory duty would provide grounds for attacking a termination pursuant to the statute. Such services, however, are not required in Indiana. Therefore, we hold that Father and Mother's discrimination claim cannot serve as a basis to attack the termination order itself.

*Id.* at 830.

[21] The intent of the ADA is to ensure disabled individuals are not denied the benefits provided by a public entity. *See* 42 U.S.C. § 12101(b). If the ADA applied to termination of parental rights proceedings, DCS would be required to reasonably accommodate Father's disability.

[22] Here, Father was provided an interpreter by DCS through Deaf Community Services. He expressed no issues with understanding any of the provided interpreters. Family case manager Caudill also explained to Father why he was required to complete the court-ordered services. Visitation with Child was contingent on Father participating in these services, which is a common and productive condition in CHINS proceedings.[9]

---

[9] Although Father argues that he was denied visitation with Child, the record reflects that supervised visitation with Child was reinstated after a recommendation from Child's therapist in 2010. Father did not complete the court-ordered services to which he consented in the agreed entry but was still able to visit Child on a monthly basis.

[23] Further, based on Father's psychiatric evaluation, DCS recommended counseling and that he see a psychiatrist to obtain medication. Like other court-ordered and DCS-recommended services, Father failed to comply. He also denied during the termination proceeding that he had any cognitive or thinking issues that limit his ability to understand what was occurring. Based on the record, we hold that DCS reasonably accommodated Father's disability, and we cannot say that DCS discriminated against Father in violation of the ADA.

[24] Father cites to a recent United States Department of Justice, Civil Rights Division and United States Department of Health and Human Services, Civil Rights Division joint decision which he claims rejected the argument that the ADA could not be raised as a defense in a termination hearing. *See* DJ No. 204-36-216, HHS No. 14-182176.[10] However, Father fails to explain how a federal investigation of the Massachusetts Department of Children and Family is binding precedent under Indiana law. Father also cites to a recent Utah Supreme Court case, *State In Interest of K.C.*, 362 P.3d 1248 (Utah 2015) to support his position. In *K.C.*, the court held that the ADA applies in termination proceedings, but found that under the circumstances that DCFS provided reasonable accommodations to mother and affirmed the termination of her parental rights. *Id.* at 1249.

---

[10] Available at http://www.ada.gov/ma_docf_lof.doc

*K.C.* is distinguishable because the mother in *K.C.* raised her ADA claim during the termination hearing, which Father failed to do in the case before us. Rather, he raises this issue for the first time on appeal. Similarly, we have concluded in this case that DCS provided reasonable accommodations to Father. Finally, the cases to which Father cites are at most persuasive and not binding in our jurisdiction. Therefore, we decline to abandon our prior holding in *Stone* regarding the ADA's application in termination of parental rights proceedings.

For all of these reasons, we conclude that Father waived the issue of whether the ADA applies in a termination of parental rights proceeding. Waiver notwithstanding, Father's discrimination claim cannot serve as a basis to attack the trial court's termination order.

Affirmed.

Vaidik, C.J., and Barnes, J., concur.