## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 25 2017, 10:32 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT E.S.

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEY FOR APPELLANT G.E.

James A. Edgar
J. Edgar Law Offices, Prof. Corp.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James D. Boyer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of J.S. & H.E., Minor Children, E.S., Mother, & G.E., Father

*Appellants-Respondents*,

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*.

September 25, 2017

Court of Appeals Case No.
49A02-1703-JT-444

Appeal from the Marion Superior Court

The Honorable Marilyn Moores, Judge

The Honorable Larry Bradley, Magistrate

Trial Court Cause Nos.
49D09-1603-JT-231
49D09-1603-JT-232

**Brown, Judge.**

[1] E.S. ("Mother") and G.E. ("Father," and together with Mother, "Parents") appeal the involuntary termination of their parental rights with respect to their children J.S. and H.E. (the "Children"). Mother raises one issue and Father raises four issues which we consolidate and restate as whether the trial court erred in terminating their parental rights. We affirm.

## Facts and Procedural History

[2] In February 2014, Mother, who was pregnant at the time, was picked up by an ambulance and placed in inpatient service for her behavioral health. On March 28, 2014, Mother gave birth to J.S. Family case manager Jon Bush ("FCM Bush") was initially assigned to the assessment involving J.S. At some point, Mother told FCM Bush that there was a "lack of pre-natal care on her end." Transcript Volume II at 37. On April 1, 2014, DCS filed a verified petition alleging J.S. to be a child in need of services ("CHINS"). The petition alleged Mother failed to provide J.S. a safe and secure home free from untreated mental health concerns, Mother suffers from schizophrenia and demonstrated behavior preventing J.S. from being safe in her care, this behavior included threatening medical staff and stating that J.S. would be sacrificed, and that Father was the alleged father and his whereabouts were unknown. On July 28, 2014, the court found J.S. to be a CHINS.

[3] On August 27, 2014, the court ordered Mother to become engaged in a home-based counseling program, complete a psychological evaluation, meet with medical/psychiatric personnel, attend all scheduled parenting time appointments, and participate in home-based case management services.

[4] In March 2015, Mother gave birth to H.E. Father, who suffers from schizophrenia, is the father of both J.S. and H.E. That month, DCS filed a request for filing of a CHINS petition with respect to H.E., which the court granted. On July 15, 2015, the court entered an order stating that it received from DCS an Admission and Agreement on Services signed by Parents to reflect that H.E. was a CHINS because Parents have an ongoing CHINS case in which they had not completed services. That same day, the court ordered Parents to participate in services.

[5] On March 9, 2016, the court entered an order changing the plan for the Children from reunification to adoption and finding that no services were in place due to lack of participation, mental health services had been closed for lack of participation, Parents had not visited during the reporting period, and Parents had never engaged in at least three rounds of referrals for "HBCM and HBT."[1] Petitioner's Exhibit 3.

[6] On March 22, 2016, DCS filed a verified petition for the involuntary termination of the parent-child relationship between the Children and Parents. On January 30, 2017, the court held an evidentiary hearing. FCM Bush, Tanya Edwards, a home-based caseworker, Emily Sabau, a therapist, Krista Caughey, a DCS family case manager supervisor, Kirk Toles, a recovery clinician,

---

[1] "HBCM and HBT" appear to refer to home-based case management and home-based therapy as the court entered other orders listing "HOME BASED THERAPY" and "HOME BASED CASE MANAGEMENT." *See* Petitioner's Exhibits 7, 24, 30.

Charles Kelly, Father's case manager and recovery clinician, family case manager Shanna Jaggers ("FCM Jaggers"), guardian ad litem Lashonda Wilson ("GAL Wilson"), and family case manager Constance Bowlick ("FCM Bowlick") testified.

[7] On February 7, 2017, the court granted the petition to terminate Parents' parent-child relationship. Specifically, the court's order states:

> Upon evidence presented, the Court now finds *by clear and convincing evidence*:
>
> * * * * *
>
> 15. Multiple service referrals were made for the parents including at least five referrals for therapy, six for case management, and eight referrals for parenting time.
>
> 16. The parents were inconsistent in therapy and parenting time, leading to the close of those services due to a lack of participation.
>
> 17. [Mother] was diagnosed with schizophrenia early in life. She does not believe she has a mental illness, and reluctantly allows medication to be administered intramuscularly but only to comply with a court ordered commitment. She was in need of an injection on the day of trial.
>
> 18. [Mother] does not feel she needs mental health medication and does not like the way it makes her feel.
>
> 19. [Mother] needed a lot of assistance with her children during parenting time. Visit facilitator Tanya Edwards worked with [Mother] for six months and felt that [Mother] would always need supervision in her parenting.

20. On medication, [Mother] still exhibited paranoid ideations including an ongoing belief of unseen cameras and recorders in her home and other places, and has auditory hallucinations.

21. [Mother] has shown aggressive behavior and had tried to "cleanse" her mental health clinic by setting it on fire.

22. Kirk Toles has been working with [Mother] as a recovery clinician for several years. He described her behavior as erratic all the time and fears for her safety as a result of poor judgment.

23. Evidencing her lack of insight is her belief that she does not need services, and thought she would receive her children back at the April 2016 Initial Hearing in this termination case.

24. [Father] also carries a diagnosis of suffering from schizophrenia. He is lower in his functioning than [Mother] who he relies on for help with activities of daily living.

25. [Father] was observed as being inappropriate in his interactions with the children during parenting time, and he sleeps a lot.

26. [Father's] recovery clinician for the past five or six years describes him as making poor choices and having poor decision making, even on medication.

27. [Father] has recently been admitted inpatient for treatment.

28. [Mother] and [Father] receive disability income. Gallahue Mental Health is the couple's payee, although [Mother] feels they are stealing from her.

29. The parents are presently in need of a stove and bed.

30. [J.S.] and [H.E.] are placed together with their maternal aunt and uncle. This placement is preadoptive.

31. The children were placed in their present relative care at young ages. They have never resided with their parents.

32. The children have been observed as being healthy and happy, and bonded with their caregivers.

33. The children are developmentally on target.

34. The children's plan for permanency was changed from reunification to adoption on March 9, 2016.

35. The continuation of the parent-child relationship poses a threat to the children's well-being. Parents have a very hard time maintaining themselves and would not be able to safely and appropriately care for [J.S.] and [H.E.]. It is unlikely that they could meet the children's needs, including emotional and educational. Termination of the parent-child relationship would allow the children not to be traumatically removed from the only home they have known, but allow them to be adopted and made a permanent part of the family.

36. There is a reasonable probability that the conditions that resulted in the children's removal and continued placement outside the home will not be remedied by their parents. [Parents] have been referred services on a number of occasions but have not overcome conditions due to inconsistency. Unfortunately, the parents' mental health issues, and the denial of those issues, would also remain a barrier to remedying conditions.

37. Termination of the parent-child relationship is in the best interests of the children. Termination would allow them to be adopted into a safe, stable and permanent home where they can continue to develop.

38. There exists a satisfactory plan for the future care and treatment of the children, that being adoption.

39. Given the parents' participation, safety concerns, and the current safe and stable home, the children's Guardian ad Litem agrees with the permanency plan of IDCS.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED** that the parent-child relationship between [J.S.] and [H.E.] and their parents [Mother] and [Father] is hereby terminated.

Mother's Appendix Volume II at 33-35.

## Discussion

The issue is whether the trial court erred in terminating Parents' rights. Mother argues that the court based its conclusions on evidence of her actions while engaged in services provided by DCS which did not comply with the Americans with Disabilities Act ("ADA"). Mother points out that she told Caughey that she had negative feelings toward Gallahue and yet Caughey chose Gallahue to provide home-based therapy and case management services. She also asserts that Caughey did not determine whether Sabau, the therapist at Gallahue, had any experience or education relating to mentally ill persons or whether Sabau was licensed to treat persons with mental disorders. She argues that Sabau's recommendation for specialized treatment was rejected by DCS. Mother also asserts that providing her with consistent transportation would have been a reasonable modification seemingly required by the ADA to ensure she was able to participate effectively in services despite her mental illness. She acknowledges that "Indiana courts historically have refused to allow a parent to raise a claim under the ADA as a defense to the termination of parental rights." Mother's Brief at 23 (citing *Stone v. Daviess Cty. Div. of Children & Family Servs.*, 656 N.E.2d 824 (Ind. Ct. App. 1995), *trans. denied*). Mother also points to a 2016 opinion dissenting to the denial of transfer, *N.C. v. Ind. Dep't Of Child*

*Servs.*, 74 N.E.3d 1203 (Ind. 2016) (David, J., dissenting from denial of petition to transfer).

[9] Father argues that DCS denied him equal protection and due process of law in the provision of services. He contends that DCS ensured his failure in its provision of parenting time by not allowing him to hold H.E. due to a fear that he would fall asleep and that the possibility of him falling asleep while holding H.E. did not present a grave risk. He asserts that DCS failed to give him notice of meetings, that DCS stopped following the court's plan for reunification in November 2015, and that DCS violated the ADA by providing inappropriate services and by counting the side effect of his medication against his progress in services.

[10] Parents also assert that the evidence and findings do not support the conclusions that continuation of the parent-child relationship poses a threat to the Children's well-being, there is a reasonable probability that the conditions which resulted in the Children's removal and continued placement outside the home will not be remedied, and termination of the parent-child relationship is in the best interests of the Children.

[11] DCS maintains that Parents' arguments that DCS failed to comply with the ADA and Father's arguments that DCS denied him equal protection and due process are waived and misplaced. DCS also argues that the unchallenged findings of fact support its judgment and that Parents' challenges are a request to reweigh the evidence.

## A.  *ADA and Due Process*

[12]    Even assuming Parents did not waive this issue, we cannot say that reversal is required.  "Congress enacted the ADA to eliminate discrimination and create causes of action for qualified people who have faced discrimination." *N.C. v. Ind. Dep't of Child Servs.*, 56 N.E.3d 65, 69 (Ind. Ct. App. 2016) (citing 42 U.S.C. § 12101(b)), *trans. denied*.  The ADA provides in part: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  "The ADA requires that the public entity make 'reasonable accommodation' to allow the disabled person to receive the services or to participate in the public entity's programs." *N.C.*, 56 N.E.3d at 69-70 (quoting 28 C.F.R. § 35.130(b)(7)).

[13]    In *Stone v. Daviess Cty. Div. of Children & Family Servs.*, 656 N.E.2d 824 (Ind. Ct. App. 1995), *trans. denied*, we addressed whether the ADA requires that prior to termination of parental rights DCS must establish it has made reasonable accommodation in providing services for the special needs of disabled parents. We reasoned that if our termination statute required that services be provided to all parents prior to the termination of parental rights, under the doctrine of preemption an ADA violation by DCS in fulfilling that statutory duty would provide grounds for attacking a termination pursuant to that statute.  656 N.E.2d at 830.  We held that the parents' discrimination claim could not serve as a basis to attack the termination order itself because such services are not

required in Indiana. *Id.* We went on to state that, "[a]side from the operation of our termination statute, once the agency opts to provide services during the CHINS proceedings to assist parents in improving parental skills, the provision of those services must be in compliance with the ADA." *Id.* We also stated that "any alleged noncompliance with the ADA by [DCS] in the provision of services in the CHINS proceedings would be a matter separate and distinct from the operation of our termination statute." *Id.* We held that, even if the parents could bring their discrimination claim during the termination proceedings, the intent of the ADA is merely to ensure that disabled individuals are not denied the benefits of services provided by the public entity, and that the DCS reasonably accommodated the parents' disability. *Id.* at 830-831.

[14] We recently addressed whether the ADA applies in termination proceedings in *N.C.* We held that it was well-settled under *Stone* that the ADA does not apply in termination proceedings. *N.C.*, 56 N.E.3d at 69. We declined to abandon the holding in *Stone* regarding the ADA's application in termination of parental rights proceedings. *Id.* at 70-71. We also addressed the father's argument that he should be entitled to use DCS's alleged failure to comply with the ADA as a defense to the termination of his parental rights, waiver notwithstanding. *Id.* at 69.

[15] In his dissent from the denial of transfer, Justice David wrote that "if DCS would be required to comply with the ADA when it provides mandatory services and failure to do so could be a defense to a termination action, then when DCS uses its discretion to provide services, it must also comply with the

ADA, and accordingly, a disabled parent could raise failure to comply as a defense to a termination action." *N.C. v. Ind. Dep't Of Child Servs.*, 74 N.E.3d 1203, 1204 (David, J., dissenting from denial of petition to transfer). Justice David agreed with certain portions of *Stone*. *Id.* at 1204-1205. He then stated:

> However, despite the *Stone* court acknowledging the fact that if DCS was required to provide services, it would have to comply with the ADA and non-compliance could be used as a grounds for challenging termination of a disabled parents' parental rights, and also acknowledging that to the extent that DCS provides discretionary services, it must comply with the ADA in the provision of those services, it nevertheless concluded that: "any alleged noncompliance with the ADA by [DCS] in the provision of services . . . would be a matter separate and distinct from the operation of our termination statute." [*Stone*, 656 N.E.2d at 830]. It is this portion of *Stone* that I believe needs to be overruled.

*Id.* at 1205. He concluded that he would hold that a disabled parent may use non-compliance with the ADA as a defense to the termination of his or her parental rights where DCS has provided discretionary services, but failed to provide reasonable accommodations to a disabled parent.[2] *Id.*

[16] Even assuming that Parents could assert non-compliance with the ADA as a defense to the termination of their parental rights in these circumstances, we cannot say that reversal is warranted. The intent of the ADA is to ensure

---

[2] Justice Rucker concurred in Justice David's dissent.

disabled individuals are not denied the benefits provided by a public entity. *N.C.*, 56 N.E.3d at 70 (citing 42 U.S.C. § 12101(b)). If the ADA applied to termination of parental rights proceedings, DCS would be required to reasonably accommodate Parents' disabilities. *See id.*

[17] To the extent Parents assert that certain individuals working with them did not have proper training, we disagree. The individuals who ew~!worked with Mother and Father testified regarding their training. On cross-examination, therapist Sabau indicated that she did not have any specialized training for working with individuals who have a diagnosis of schizophrenia, and she testified that she researched schizophrenia when she received the referral and that she had a general understanding of the symptoms and capabilities of the diagnosis based on her research and educational background which included a master's degree in social work and a bachelor's degree in psychology. She also testified that she received regular supervision from a clinically licensed social worker as well as continuing education classes and trainings.

[18] Kelly, Father's case manager and recovery clinician, testified that, while he was not contracted through DCS, he received specialized training to work with individuals with mental illness, they have several trainings throughout the year, he had completed several virtual reality trainings on people who are diagnosed with schizophrenia, and he had learned to identify symptoms or common behavior patterns associated with schizophrenia. He also stated that he had been in the field about fifteen years and worked at Midtown mental health with adults and then Gallahue.

[19] Caughey, the family case manager supervisor, testified that she had a bachelor's degree in psychology and was pursuing a master's degree in social work. During cross-examination of Caughey, Mother's counsel asked: "Services, that based on your testimony, are not sure the providers knew exactly what they, based on your testimony, the providers had the appropriate qualifications to work with [Mother,] correct?" Transcript Volume II at 138. Caughey answered: "Again, from a DCS perspective, I believe that they did have the appropriate qualifications based on what our service standards require." *Id.*

[20] FCM Jaggers testified that she received training on mental health during "Cohort training." *Id.* at 209. When asked if she had any training specifically on working with individuals diagnosed with schizophrenia, she testified: "In Cohort they cover it, but I have not taken a specific course on it." *Id.* at 210. FCM Bowlick testified that she received twelve weeks of training to become a family case manager and receives ongoing training. Edwards, the home-based case worker, testified that she had a bachelor's degree in psychology and had received ongoing training through her company for the three years she had been in her position.

[21] Caughey testified that she was in regular contact with Toles, a recovery clinician who managed Mother's mental illness. Toles testified that he had specialized training for his job. When asked what kind of training, Toles answered: "We go through trainings; everything from ethics to basically knowing about her illness, how to treat it, how to teach her how to manage it." *Id.* at 144. He also testified that he had certifications regarding those

treatments, receives ongoing continuing education, works with a doctor and a team of people in his work as a recovery clinician, and that Mother saw a doctor.

[22] As for the referrals to Gallahue, Caughey, the family case manager supervisor, discussed this issue. While Caughey testified that Mother told her that she had a serious conflict or a serious personal feeling toward Gallahue, when asked why she referred Mother to additional referrals at Gallahue, Caughey answered:

> Because [Mother] had not been successful in the other two locations and they had difficulty reaching her, and I felt like if we put the referral at Gallahue, she would have more success with being able to coordinate with Mr. Toles. Since she was going to Gallahue on a bi-weekly basis that she may have more – they would have additional access to her. She could have a change [sic] to be more successful.

*Id.* at 140. The following exchange also occurred:

> [Mother's Counsel]: You believe that she would be more successful working with an agency who she expressly told you that she had a serious problem with.

> [Caughey]: I felt like she would be more successful with an agency that was able to contact her and locate her. Then once she engaged with the therapist, case manager there, that would be a different person for Mr. Toles that I was hopeful that they would be able build [sic] a relationship.

*Id.* Caughey also testified that she tried other providers but "it wasn't successful" because Mother did not respond. *Id.* at 141. Specifically, Mother attended one appointment with Dockside, but then did not attend any additional appointments and did not respond to the case manager to participate at Dockside. Toles who worked at Gallahue testified that Mother "will fire [him] every now and then. Then she will say, where is he at? I want him back." *Id.* at 166.

[23] The record also reveals that accommodations were made. Edwards, the home-based caseworker, testified that her agency tried to make accommodations to schedule around Parents' work schedule. As to transportation, Edwards testified that she provided some transportation for Parents to see the Children. Caughey testified that she made bus pass referrals. She also testified: "Mother reported that she didn't have access to a vehicle. Mr. Toles would be, was available to her to transport her to appointments. That was provided to her as an option for all of her appointments that we had set-up or discussed, and also bus passes were provided." *Id.* at 142. Caughey testified that Mother gave the bus passes to her family members and was "not using them for herself." *Id.* We cannot say that DCS failed to provide reasonable accommodations to Parents or violated the ADA.

[24] To the extent Father asserts that his due process rights were violated with respect to the effect of his sleepiness, we observe that Caughey testified that she believed Father's recovery clinician reported that the medication should not be making Father that sleepy and that "it was more of a life style that he was

staying up to [sic] late, especially and then he was sleepy during the day." *Id.* at 119. With respect to Father's assertion that DCS failed to give him notice of meetings, the record reveals that DCS attempted to contact Parents on multiple occasions as more fully detailed below. We cannot say that Father's due process rights were violated.

B. *Sufficiency*

In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. *See* Ind. Code § 31-35-2-8(a).

[26] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id*. We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Id*. We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id*.

[27] This review is not a license to reweigh the evidence. *Id*. "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which require*s the reviewing court itself* to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id*. (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967))). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id*. (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial

Rule 52(A))). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id.* at 640.

1. *Remedy of Conditions*

[28] We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of the Children outside the home will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

[29] In determining whether the conditions that resulted in the Children's removal will not be remedied, we engage in a two-step analysis. *E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior

history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of future behavior. *Id.*

[30] "The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home." *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013) (citation and internal quotation marks omitted). A court may consider evidence of a parent's prior criminal history, history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services, and, where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.*

[31] To the extent Parents do not challenge the court's findings of fact, these unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*. Mother concedes that she has a mental illness, and Father acknowledges that he and Mother suffer from schizophrenia. Mother acknowledges that she was hospitalized for mental illness and was under an involuntary commitment at the time of the termination hearing.

[32] The record supports the trial court's finding that Parents were inconsistent in therapy and parenting time leading to the close of the services due to a lack of participation. Edwards testified that she supervised Parents' visits with the Children from May 2015 to December 2015, that "[w]hen it started it was three visits, and then it went to two visits," then Parents began to miss visits, and "[e]ventually it dwindled down to no visits." Transcript Volume II at 43. Edwards testified that Parents had approximately seven "no call, no show visits." *Id.* at 56. Sabau testified that Parents "had about two no-shows, maybe three and one cancellation." *Id.* at 77. FCM Jaggers, who was assigned the case from November 2015 to October 2016, testified that she attempted to contact Parents several times via phone, would mail them information, attempted to text them, and worked with the resource family to find their current locations. She testified that Parents "really never returned phone calls" and she was unable to meet them and did not physically meet them until a hearing in March 2016. *Id.* at 200. FCM Bowlick, who was assigned the case in October 2016, attempted to call Parents three times, left voicemails, and went to the home but was unsuccessful in contacting Parents. FCM Bowlick tried calling Parents a few times in November and December and left voicemails. On December 19, 2016, Mother called FCM Bowlick and told FCM Bowlick that she had been working with Gallahue, that she discontinued services with another provider because "they were making her husband do things, that he shouldn't have been doing." *Id.* at 237. FCM Bowlick asked Mother to provide an address, but Mother was "just not responsive." *Id.* at 242.

[33] Edwards testified that Parents would come extremely early or late to visit, "they were not all the way there," and "they seemed a little bit confused." *Id.* at 45. She testified that Father showed up two or three times on days when visits were not scheduled. When Edwards talked to Father about showing up on such days, Father said he "had started getting kind of cloudy." *Id.* at 49. Sabau testified that she had very few discussions with Father and he was either sleeping or in and out of the house during the visits. Father also called the Children derogatory names including that they were ugly and stupid, which was upsetting to Edwards and the Children. During one visit, Father played "boogey man" with J.S., who became very frightened and "just screamed and squirmed until she was taken from him and held and told it was . . . going to be okay." *Id.* at 50.

[34] Edwards observed that Mother tried to handle the Children at the same time, but she was unable to do it properly, became frustrated and overwhelmed, and would take a break, and that Edwards would take care of the children. Edwards also observed that Parents were fine serving the Children cold foods, but she would have to monitor Parents if they were cooking anything because they would heat the foods too much including melting a package in the microwave. When asked to describe Parents' progress throughout the whole time she met with them and if they made progress, Edwards testified: "No. I don't think they made progress." *Id.* at 61. FCM Bowlick testified that DCS was recommending adoption because none of the services had been completed.

[35] As for Parents' mental illness, Sabau testified that Mother told her she was hearing voices, thought there were tape recorders around, attributed the voices to ISIS, thought ISIS had tape recorders in her house and was listening to her and watching her, and that she heard the voices at home and on the bus. Sabau testified that she was concerned Mother's symptoms were worsening and that she had some concerns regarding safety. Toles testified that it is challenging trying to make Mother understand that her schizophrenia and symptoms are real. Caughey, FCM Bush, and Sabau also testified to Mother's disagreement with her diagnosis. Toles testified that he had never seen Mother "truly complying all the time" with her medications. *Id.* at 155. When asked whether he had observed erratic behavior when working with Mother during the past six months, Toles answered: "Yes, that happens all the time." *Id.* He stated that Mother loves her daughter "[b]ut she can't take care of her in the way that she needs to," "[s]he just can't . . . [b]ecause mentally, she can't do it, she can't." *Id.* at 162.

[36] Kelly, Father's case manager and recovery clinician, testified that Father does not believe that he has mental illness and that he has tried to inform Father that he is actually diagnosed with schizophrenia. He also testified that when Father is decompensating, he thinks that he has super powers, will say he does not need the medicine because he has his "own spirits within himself," and becomes paranoid. *Id.* at 177. He also testified that Father was outside in the nude, which was a common symptom Father exhibited, prior to his last admission to the hospital. Kelly also testified that Father can become

delusional and described his decision making as poor. When asked what erratic behavior he had observed in the past six months with Father, Kelly testified that Father had been discharged twice from the hospital when he should not have been and that "when he came out he still had that I'm mad at the world attitude, beat people up." *Id.* at 184. Kelly testified that he had never recommended that the Children be placed back in Parents' care because Father has an issue with trying to maintain himself. He testified that Father will take his medicine, has stated that he does not want to take his medicine because he "doesn't feel like he needs it," and says "he has a spirit within that he doesn't need the medication." *Id.* at 179. He testified that he thought "without prompting [Father] wouldn't take" medication, and that "with prompts he would." *Id.* at 182. Toles testified that Father's symptoms are "pretty severe" and that he "has been having a lot of problems with his psychosis." *Id.* at 147.

[37] Based upon the court's findings and the record, we conclude that clear and convincing evidence supports the trial court's determination that there is a reasonable probability that the conditions leading to the Children's removal will not be remedied. *See In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005) (concluding that the trial court properly terminated the parent-child relationship where a parent with mental health impairment participated in but failed to benefit from services).

    2. *Best Interests*

[38] We next consider Parents' assertion that DCS failed to demonstrate that termination of their parental rights was in the Children's best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests, and the Court has stated that children cannot wait indefinitely for their parents to work toward preservation or reunification, and courts need not wait until the child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re E.M.*, 4 N.E.3d at 647-648. However, "focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry . . . ." *Id.* at 648. Recommendations of the case manager and court-appointed advocate, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re A.S.,* 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*.

[39] FCM Jaggers testified that Parents did not participate in services, that DCS felt that the rights of Parents needed to be terminated, and she felt that returning the Children to Parents' care would put the Children's safety at risk. GAL Wilson

testified that she believed adoption was in the Children's best interest and that "[b]ecause they are so young, and they have been in that home for that long, the information that I have received, is that they, as far as the parent's visitation and contact with them, they don't really have a bond." Transcript Volume II at 226. She also testified that "[t]here is no bond between the children and [Mother and Father]. They don't recognize them as their parents." *Id.* at 227. GAL Wilson testified that Parents have not proven that they can parent in two years and that it was not fair to the Children to "have their life, prolonged and in limbo . . . ." *Id.* at 227. When asked what continued safety concerns she had, she testified that she was concerned with Parents' mental health. FCM Bowlick testified that she believed that termination of the parental rights was in the best interests of the Children.

[40] Based on the testimony, as well as the totality of the evidence in the record and set forth in the court's termination order, we conclude that the determination that termination is in the best interests of the Children is supported by clear and convincing evidence.

### Conclusion

[41] We conclude that the trial court's judgment terminating the parental rights of Parents is supported by clear and convincing evidence. We find no error and affirm.

[42] Affirmed.

Najam, J., and Kirsch, J., concur.