## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 21 2019, 8:42 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Danielle L. Gregory
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Matthew Michaloski
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of Parental Rights of:

I. H.,

and

E. H. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner,*

and

February 21, 2019

Court of Appeals Case No.
18A-JT-2231

Appeal from the Marion Superior Court

The Honorable Marilyn Moores, Judge

The Honorable Larry Bradley, Magistrate

Trial Court Cause No.
49D09-1802-JT-183

Child Advocates, Inc.,

*Appellee-Guardian Ad Litem.*

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, E.H. (Mother), appeals the termination of her parental rights to her minor child, I.H. (Child).

We affirm.

# ISSUE

Mother raises one issue on appeal, which we restate as: Whether the Indiana Department of Child Services (DCS) presented clear and convincing evidence to support the trial court's termination of Mother's parental rights.

# FACTS AND PROCEDURAL HISTORY

Mother gave birth to the Child on December 21, 2014. The Child's putative father was alleged to be either J.H. or J.T. The Child was initially removed from Mother's care on July 12, 2016 due to allegations of abuse and neglect. Two days later, on July 14, 2016, DCS filed a Child in Need of Services

(CHINS) petition, alleging that Mother had failed to provide the Child with a safe, stable, and appropriate living environment free from domestic violence. DCS claimed that Mother had shown "a propensity of violence as evidenced by her involvement in two altercations within a month—each within the presence of the Child." (Petitioner's Exh. 1, p. 4). During the altercation, a window was broken and Mother was punched in the face. When police officers arrived at the scene, Mother refused to disclose the location of the Child, declaring "you'll never find her." (Petitioner's Exh. 1, p. 4). Marijuana and paraphernalia were located in the residence and Mother admitted to being a regular user.

[5] During the pre-trial hearing on August 1, 2016, the trial court ordered the Child returned to Mother, contingent on Mother's participation in home-based therapy, home-based case management services, random drug screens, and a domestic violence assessment. Mother cared for the Child for approximately two-and-one-half months, until she became "overwhelmed" and voluntarily placed the Child in the care of Mother's former foster parents. (Petitioner's Exh. 5, p. 24).

[6] On November 7, 2016, the trial court adjudicated the Child to be a CHINS based on Mother's history of domestic violence, her failure to successfully complete classes, her eviction from the residence, and her on-going drug abuse. Although the trial court initially placed the Child with Mother's former foster parents, in January 2018, the trial court placed the Child with the daughter and husband of Mother's former foster parents (Foster Parents). On December 5, 2016, the trial court ordered Mother to participate in supervised parenting time,

in addition to her participation in home-based case management, submission to random drug screens and to follow all recommendations of her service providers.

[7] During the pendency of the CHINS proceedings, Mother was in and out of jail. Following a June 2, 2016 domestic violence incident, Mother was charged with seven Counts. She pled guilty to domestic battery as a Class A misdemeanor and was sentenced to probation. On March 29, 2017, Mother pled guilty to possession of methamphetamine, after being charged with three drug-related Counts, and was given a suspended sentence of 365 days. Mother's probation was revoked on May 10, 2017—following her guilty plea to Level 6 felony invasion of privacy—and the court amended her sentence to community corrections. Mother subsequently fled to Tennessee for several months to avoid an outstanding warrant. Upon her return to Indiana in October 2017, she was arrested while visiting the Child and incarcerated for approximately three months.

[8] Mother was not consistently employed because her criminal history made it "very difficult" to find a position. (Transcript p. 45). Mother also failed to benefit from court-ordered services. While Mother initially participated in domestic violence therapy, she stopped attending sessions in November 2016. DCS referred her again for classes in 2017, but Mother could not be reached. She eventually engaged in individual therapy upon her release from incarceration in 2018; however, these services were not provided by DCS and information from the sessions was not submitted to DCS. Likewise, Mother

did not successfully complete home-based case management. DCS deemed the service necessary because Mother was facing homelessness and the classes would aid her in finding stability and housing. Although Mother participated in the beginning, DCS closed out this service in November 2016 after a period of non-attendance. Mother was again referred in 2017, but then refused to participate.

[9] Mother never graduated from supervised visitation because she failed to utilize her parenting time in order for DCS to recommend a change. While parental visits were suspended in October 2017 due to non-compliance and her incarceration, visitation was resumed in January 2018. After the visits with Mother resumed, a change was noted in the Child's behavior, with her becoming unruly and disrespectful. Mother did not always respond to this behavior appropriately and occasionally broke down in tears, prompting her to end visits with the Child early.

[10] Mother was addicted to illegal drugs before and during the pendency of the CHINS proceeding. She admitted to regular use of marijuana and was found to be in possession of marijuana and paraphernalia during her June 2016 arrest. After leaving the Child with her former foster parents, Mother became addicted to methamphetamine and pled guilty to possession thereof in March 2017. The drug screen referral was eventually closed out for noncompliance. If Mother had been compliant and engaged in random drug screens since July 2016, DCS would have received results for "more than 50 drug screens." (Tr. p. 81). In

actuality, only about 5 were received, and the test results were "mostly positive." (Tr. p. 84).

[11] At the time of the termination hearing, the Child had been placed outside of Mother's care for twenty months. She was "thriving" with her Foster Parents, who intend to adopt her. (Tr. p. 106). Even though the Child is doing well, she became susceptible to nightmares and wakes up crying after the visits with Mother resumed in January 2018. Foster Parents noticed that the Child is "really tired" and "completely drained of all her energy" following visits. (Tr. p. 70). The Child was referred for therapeutic services to identify any stress and to learn coping skills. While at first the Child was observed to be carefree, she later started to express anger. The therapist correlated the Child's acting out with the parenting time sessions with Mother, and expressed a concern that the visits were a trigger for the Child's adverse behavior.

[12] On February 13, 2018, DCS filed a petition for the involuntary termination of Mother's parental rights, as both alleged fathers consented to the adoption of the Child. On July 10, 2018 and August 1, 2018, the trial court conducted a hearing on DCS's petition. During the hearing, Family Case Manager Cinthya Trujillo (FCM Trujillo) testified about the Child's removal, the domestic violence concerns, Mother's failure to complete services, her drug abuse, unemployment, and inability to financially provide for her or her Child. FCM Trujillo advised against placement with Mother because Mother "was in and out of jail and not meeting with providers to help her to get stable and make positive life changes to her lifestyle." (Tr. p. 82). She opined that continuation

of the parent-child relationship posed a threat to the Child's well-being, that termination was in the Child's best interests, and that the pre-adoptive home with the Foster Parents was an appropriate placement. The Child's Guardian *ad Litem* (GAL) expressed concern about Mother's substance abuse and the possibility that her temporary living arrangements could suddenly end. She advised that termination of Mother's rights would be in the Child's best interests. In her opinion, additional time for Mother to complete the services was not warranted because Mother "has had ample opportunity to complete the services but due to her criminal warrants and her fleeing or leaving the state to get sober and to avoid warrants," she put "herself in a position to not be able to complete the services and that should not delay the progress or permanency for" the Child. (Tr. p. 111). On August 20, 2018, the trial court terminated Mother's parental rights to the Child, concluding, in pertinent part:

> 30. There is a reasonable probability that the conditions that resulted in [the Child's] removal and continued placement outside the home will not be remedied by her [M]other. Two years have elapsed since [the Child's] CHINS case was filed and no services have been completed to address domestic violence, past trauma and mental health concerns and stable independent housing with adequate income. Sobriety has not been demonstrated.

> 31. There is a reasonable probability that the continuation of the parent-child relationship poses a threat to [the Child's] well-being in that it would pose as a barrier to obtaining permanency for her through an adoption which [Mother] has not put herself in a position to offer permanency.

**\*\*\*\***

42. Termination of the parent-child relationship is in the best interests of [the Child]. Termination would allow her to be adopted into a stable and permanent home where her needs will be safely met.

43. There exists a satisfactory plan for the future care and treatment of [the Child], that being adoption.

(Appellant's App. Vol. II, pp. 83-84).

[13] Mother now appeals. Additional facts will be provided if necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

[14] Mother challenges the termination of her parental rights to the Child. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). However, parental rights "are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Id.* If "parents are unable or unwilling to meet their parental responsibilities," termination of parental rights is appropriate. *Id.* We recognize that the termination of a parent-child

relationship is "an 'extreme measure' and should only be utilized as a 'last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed.'" *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015).

[15] Indiana courts rely on a "deferential standard of review in cases concerning the termination of parental rights" due to the trial court's "unique position to assess the evidence." *In re A.K.*, 924 N.E.2d 212, 219 (Ind. Ct. App. 2010), *trans. dismissed*. Our court neither reweighs evidence nor assesses the credibility of witnesses. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We consider only the evidence and any reasonable inferences that support the trial court's judgment, and we accord deference to the trial court's "opportunity to judge the credibility of the witnesses firsthand." *Id.* Where, as in this case, the trial court enters special findings of fact and conclusions thereon under Indiana Trial Rule 52(A), we evaluate whether the trial court's decision is clearly erroneous. *Id.* Under this standard, we must determine "whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment." *Id.* at 1230.

## II. *Termination of Parental Rights Statute*

[16] In order to terminate a parent's rights to her child, DCS must prove:

> (A) that one (1) of the following is true:
>
> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> * * * *

> (iii) The child has been removed from the parent and has been under the supervision of a local office . . . for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a [CHINS] . . . ;
>
> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS];
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each of the foregoing elements by clear and convincing evidence. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014). "[C]lear and convincing evidence requires the existence of a fact to 'be highly probable.'" *Id.* On appeal, Mother does not contest the trial court's findings that the Child has been removed from the home for the requisite period of time.

## A. *Conditions have not been remedied*[1]

[17] Mother claims that there is insufficient evidence to support the trial court's determination that the conditions which resulted in the removal of the Child have not been remedied. It is well established that "[a] trial court must judge a parent's fitness as of the time of the termination hearing and take into consideration evidence of changed conditions." *Stone v. Daviess Cnty. Div. of Children & Family Servs.*, 656 N.E.2d 824, 828 (Ind. Ct. App. 1995), *trans. denied*. In judging fitness, a trial court may properly consider, among other things, a parent's substance abuse and lack of adequate housing and employment. *McBride v. Monroe Co. OFC*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). The trial court may also consider a parent's failure to respond to services. *Lang v. Starke Co. OFC*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. "[H]abitual patterns of conduct must be evaluated to determine whether there is a substantial probability of future neglect or deprivation." *Stone*, 656 N.E.2d at 828. A trial court "need not wait until the children are irreversibly influenced by their deficient lifestyle such that their physical, mental and social growth is permanently impaired before terminating the parent-child relationship." *Id*. Furthermore, "[c]lear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very

---

[1] Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive; therefore, DCS is required to prove only one of three listed elements. *See In re A.K.*, 924 N.E.2d at 220-21. In this case, the trial court based its termination decision on DCS's satisfaction of Indiana Code section 31-35-2-4(b)(2)(B)(i) & (ii)—that the conditions that resulted in the Child's removal have not been remedied and the continuation of the parent-child relationship poses a threat to the Child's well-being.

survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *K.T.K.*, 989 N.E.2d at 1230.

[18] The trial court found that

> There is a reasonable probability that the conditions that resulted in [the Child's] removal and continued placement outside the home will not be remedied by her [M]other. Two years have elapsed since [the Child's] CHINS case was filed and no services have been completed to address domestic violence, past trauma and mental health concerns, and stable independent housing with adequate income. Sobriety has also not been demonstrated.

(Appellants' App. Vol. II, p. 83).

[19] In support of her argument that the conditions which resulted in the removal of the Child have been remedied, Mother admits that while there might have been a brief period of homelessness, she now has secured stable housing with a friend. At the time of the termination hearing, she reported that she had several job interviews and was financially supported by her friend until she could find suitable employment. She claims to have voluntarily addressed her domestic violence and trauma concerns by seeing a therapist every other week upon her release from incarceration and voluntarily submitted to drug screens through an independent agency. Despite her challenges in parenting the Child during supervised visitations, Mother asserts that she enjoys a close bond with her daughter.

[20]     Upon review of the evidence, we find that DCS clearly established that Mother did not remedy the conditions which resulted in the removal of the Child in the first place. Mother was referred to case management services on August 1, 2016; however, due to non-participation, the service was closed out by November 2016. Even when DCS offered to reestablish certain services after these had been discontinued due to Mother's noncompliance, Mother refused. Likewise, Mother failed to successfully complete therapy to address her trauma and domestic violence issues. Although Mother voluntarily attended therapy sessions prior to the termination hearing, these services were not conducted through DCS and information from the sessions was not submitted to the trial court or DCS.

[21]     At the termination hearing, it was revealed that Mother did not have any "independent housing during the CHINS case" and was living with a friend since January 2018. (Appellant's App. Vol. II, p. 83). While Mother's friend allowed her to stay until she got on her feet, this housing arrangement was fragile because Mother's friend testified that she intended to turn Mother out if she relapsed into substance abuse. Moreover, the friend herself relied on support from her estranged husband, resulting in the trial court to conclude that "[a]lthough the housing is stable, it can change at any time." (Appellant's App. Vol. II, p. 83). Even though Mother testified to being drug-free, she failed to submit to drug screens to monitor compliance. Only about 5 were received by DCS, and the test results were "mostly positive." (Tr. p. 84). The drug screen referral was eventually closed out for noncompliance. If Mother had been

compliant with engaging in random drug screens since July 2016, DCS would have received results for "more than 50 drug screens." (Tr. p. 81). Mother now draws attention to the drug screens that she voluntarily performed through an independent agency, but this action is not the same as complying with the particular services referred to her by DCS, which included more than drug screening. At the time of the termination hearing, Mother still had not secured employment, instead relying on her friend for financial support and excusing herself by claiming that her background made it hard for her to find employment.

[22] Even though Mother attempted to regularly visit with the Child when she was not incarcerated, she never progressed to unsupervised visitation. During the visits, it was clear that Mother and Child are bonded and clearly love each other. However, testimony also reflected that, lately, the visitations had become problematic. At times, the Child would become disrespectful and unruly. Mother did not always respond to these tantrums appropriately and would break down in tears or end the visit early.

[23] Accordingly, as the record reflects substantive evidence documenting Mother's pattern of inability, unwillingness, and lack of commitment to address parenting problems, to cooperate with services, to address her substance abuse problem, and her failure to otherwise successfully complete the participation services, the trial court's conclusion that there is a reasonable probability that the conditions

that resulted in the Child's removal from Mother's care have not been remedied was not clearly erroneous.[2]

## B. *Best Interests of the Child*

[24] Mother also challenges the trial court's determination that termination of her parental rights is in the best interests of the Child. The parent-child relationship is "one of the most valued relationships in our culture." *Bester*, 839 N.E.2d at 147 (quoting *Neal v. DeKalb Cnty. Div of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). Thus, the purpose of terminating a parent-child relationship is to protect the child, not to punish the parent. *In re C.C.*, 788 N.E.2d 847, 855 (Ind. Ct. App. 2003), *trans. denied*. When considering whether termination would be in a child's best interests, the trial court must "look beyond the factors identified by [DCS] and . . . look to the totality of the evidence." *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. "The trial court need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship." *K.T.K.*, 989 N.E.2d at 1235. Permanency is a central consideration in determining a child's best interests. *Id.* "[T]he right of parents to raise their children should not be terminated solely

---

[2] Because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and we affirmed the trial court's conclusion that the conditions that resulted in the Child's removal have not been remedied, we will not address whether the continuation of the parent-child relationship poses a threat to the Child's well-being.

because there is a better home available for the children." *In re K.S.*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001).

[25] In concluding that termination would serve the Child's best interests, the trial court relied, in part, on FCM's Trujillo testimony which supported termination "due to [Mother's] poor decisions, her relying on others for stability, and the current caregivers being committed to [the Child]," as well as the GAL's statement not to allow Mother more time because "she failed to do what needed to be done and it would be unfair to deny [the Child] permanency." (Appellant's App. Vol. II, p. 84).

[26] It is well established that "[a] parent's historical inability to provide a suitable environment, along with the parent's current inability to do the same, supports a finding that termination of parental rights is in the best interests of the children." *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). Moreover, the testimony of the DCS caseworker and child advocates is sufficient to support the trial court's conclusion that termination is in the Child's best interests. *See McBride*, 798 N.E.2d at 203. Here, DCS, the Child's GAL, and FCM Trujillo all testified regarding their concerns about Mother's inability to take proper care of the Child. There is no dispute that Mother loves her; however, Mother did not have stable housing, employment, or a demonstrated and continued abstinence from methamphetamine.

[27] Furthermore, by the time of the termination hearing, the Child had been removed from Mother's care for more than twenty months, during which time

she thrived. Even though the Child is doing well, testimony by Foster Parents revealed that she has become susceptible to nightmares and wakes up crying after the visits with Mother resumed in January 2018. Foster Parents noticed that the Child is "really tired" and "completely drained of all her energy" following visits. (Tr. p. 70). The Child was referred for therapeutic services to identify any stress and to learn coping skills. While, at first, the Child was observed to be carefree, she later started to express anger. The therapist correlated the Child's acting out with the parenting time sessions with Mother, and opined that the visits are a trigger for the Child's adverse behavior.

[28] In her appellate brief, Mother identified concerns with Foster Parents' finances and mental health as a reason weighing against the trial court's conclusion. On cross-examination, Foster Parents dispelled these concerns, with foster mother explaining that she had received financial assistance a long time ago but was now working full-time. She clarified that she had never been diagnosed with any mental health issue and had no problems at the time of the hearing.

[29] Therefore, based on the totality of the evidence, we find that there is ample support for the trial court's determination that termination of Mother's parental rights is in the Child's best interests.

C. *Satisfactory Plan*

[30] As a final contention, Mother challenges DCS's plan for the future care and treatment of the Child. In order for the trial court to terminate the parent-child relationship, the court must find that there is a satisfactory plan for the care and

treatment of the child. *In re S.L.H.S.*, 885 N.E.2d 603, 618 (Ind. Ct. App. 2008). This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *Id.* Here, DCS's plan was for the Child to be adopted by Foster Parents. Accordingly, the evidence supports the trial court's finding that DCS had a satisfactory plan for the care and treatment of the Child. *See In re D.D.*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004) (concluding that the State's plan for child to be adopted by current foster parents or another family constitutes a suitable plan for child's future care), *trans. denied.*

# CONCLUSION

[31] Based on the foregoing, we conclude that DCS presented clear and convincing evidence to support the trial court's order terminating Mother's parental rights to the Child.

[32] Affirmed.

[33] Kirsch, J. and Robb, J. concur