## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 21 2020, 10:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ana M. Quirk
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Monika P. Talbot
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of
R.R.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

December 21, 2020

Court of Appeals Case No.
20A-JT-1297

Appeal from the Delaware Circuit Court

The Honorable Kimberly S. Dowling, Judge

Trial Court Cause No.
18C02-1908-JT-189 & 18C02-1908-JT-190

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, R.R. (Mother), appeals the trial court's Order terminating her parental rights to her minor children, Jy.R. and Ju.R. (collectively, Children).

We affirm.

# ISSUE

Mother presents the court with three issues, which we consolidate and restate as the following single issue: Whether the Department of Child Services (DCS) presented sufficient evidence to support its petition to terminate the parent-child relationship.

# FACTS AND PROCEDURAL HISTORY

Mother and J.R. (Father)[1] are the biological parents of Jy.R., born February 22, 2016, and Ju.R., born January 11, 2018. On March 27, 2018, DCS received a report regarding an incident of domestic violence between Mother and Father, and Father was subsequently arrested. A protective order in favor of Mother and Children was ordered against Father. At that time, newborn Ju.R. was at the neonatal intensive care unit because "she was born with her intestines outside of her body" and required surgery to correct the issue. (Transcript Vol. II, p. 170). On March 28, 2018, Mother was arrested for public intoxication

---

[1] Father's parental rights to Children were terminated and he does not participate in this appeal.

and neglect of a dependent. On March 29, 2018, due to the protective order against Father and coupled with Mother's arrest, DCS removed Children from Mother's care and placed them together in a foster home.

[5] On April 4, 2018, DCS filed a petition alleging that Children were children in need of services (CHINS). In May 2018, Children had unsupervised visitation with Father at Father's residence, but Mother was not permitted to be there because of her substance abuse issues. DCS received a report that Jy.R. was walking down the street alone. When the police arrived, they found Mother in the home. Mother knew that she was not supposed to be with Father when Father had unsupervised visitation with Children. In addition, Mother tested positive for methamphetamine on that day.

[6] During a status hearing in June 2018, Mother and Father admitted that Children were CHINS. Also, Father admitted that he had engaged in domestic violence with Mother while Jy.R. was present, and Mother admitted that she had been arrested for public intoxication while with Jy.R. Following those admissions, the trial court adjudicated Children as CHINS, and it ordered Mother and Father to maintain contact with the family case manager (FCM), allow the FCM to make unannounced visits to their homes, and not to commit further crimes.

[7] On August 31, 2018, Mother entered a substance abuse treatment program at Winchester House, and she successfully completed an inpatient twenty-one-day program, which Winchester House calls Phase 1. During Phase 1, the residents

do not leave the facility, their calls on the facility's phone are supervised, and they only have one visit per week with "their support system." (Tr. Vol. II, p. 73).

[8] On September 4, 2018, the trial court conducted a dispositional hearing and the trial court ordered Mother to continue with her treatment at Winchester House. On September 29, 2018, Mother, who had progressed to Phase 2 of her treatment at Winchester House, which allowed her to be outside the facility for a period of time with a pass, returned to the facility and was drug screened and tested for alcohol. Mother's blood alcohol content (BAC) was 0.2. On another occasion, Mother had sexual intercourse with Father in a van on Winchester House's property while she was supposed to be on a thirty-minute walk outside the facility. Due to the setbacks with her treatment, Mother was returned to Phase 1. On October 6, 2018, Mother was unsuccessfully discharged from Winchester House. Although Mother would have had the opportunity to reenter the program, she did not do so. Thereafter, Mother was only able to maintain sobriety for about a month or one and a half months at a time. On March 21, June 27, July 18, August 29, September 17 and 29, and November 22, 2019, Mother tested positive for either methamphetamine, THC, or alcohol.

[9] In April 2019, Park Center alcohol and drug therapist Valerie Runyon (Runyon) assessed Mother, and Mother disclosed to Runyon that she had been abusing substances such as methamphetamine, alcohol, and cannabis for years. Mother said that she abused methamphetamine daily. Mother also participated in therapy groups sessions at Park Center, but there had "been a pattern of lack

of follow–through" with the services. (Tr. Vol. II, p. 134). In October or November 2019, Mother started going to a methadone clinic. FCM Samantha Winans (FCM Winans) was concerned about Mother obtaining methadone because Mother had never tested positive for opiates during the CHINS case.

[10] As for visitations with Children, Mother had supervised visitation with Children while she resided at Winchester House from August 31 through October 6, 2018. Mother thereafter had supervised visitation through Lifeline. Visit Supervisor Sherry Earls (Earls) supervised Mother on fifteen visits and she observed that Mother and Children had a bond. However, Mother interacted more with child Jy.R. than with child Ju.R., and Earls had to redirect her. Earls also reminded Mother that she had to provide healthy snacks for the Children during the visits. Earls, who has experience with addicts, noticed that Mother was under the influence during one of the visits, and Earls later learned that Mother tested positive for illegal substances on that day. Mother later admitted to Earls that she was "trying not to use" drugs, but "she had just had a bad time." (Tr. Vol. II, p. 88). Earls also observed that Mother was only comfortable parenting one child at a time. There were occasions when Mother was unable to handle both children and she would walk away. Earls never recommended that Mother have unsupervised visits because Mother did not appear capable of handling Children by herself.

[11] On January 10, 2020, Mother had a visit with Children, and she was "very flustered" and "extremely excited." (Tr. Vol. II, p. 245). Mother did everything very fast, and she was "jerky, twitchy." (Tr. Vol. II, p. 245). Based

on Mother's behavior, Earls believed that Mother had used methamphetamine. (Tr. Vol. II, p. 248).

[12] From November 2018 through April 2019, Mother worked with Centerstone Family Support Specialist Stacy O'Neal (O'Neal). The two worked on parenting skills, employment, and housing. Mother was largely cooperative, but sometimes she did not appear for scheduled meetings. Mother also failed to obtain employment through O'Neal's help and lived with friends.

[13] On April 21, 2019, the trial court approved a concurrent plan for reunification and adoption for Children. On August 16, 2019, DCS filed its petitions to terminate Mother's and Father's parental rights to Children. On December 11, 2019, and February 11, 2020, the trial court held evidentiary hearings on DCS's petitions.

[14] At the time of the termination hearing, Mother still had supervised visitation with Children. FCM Winans had safety concerns because Mother was sometimes under the influence of substances during visits, and she also had other concerns as well, which involved Mother saying inappropriate things to Children during the visits. FCM Winans also did not think Mother would be able to care for Children on her own. FCM Winans opined that Children's foster placement was appropriate and that Children were well bonded with the foster family and the other children in the household. Mother also had not obtained stable housing and she was living in a motel in Muncie with her boyfriend who was on house arrest. FCM Winans opined that the motel was

not a safe place for Children because during supervised visits, individuals with ankle monitors were seen in the common areas of the motel.

[15] CASA Miles Hill (CASA Hills) testified that he began visiting Children's foster home in June 2018. CASA Hill opined that Children's needs were met at the foster parents' home and that Children were thriving and well-bonded in their pre-adoptive home. CASA Hill supported the plan for Children's adoption and opined that adoption was in Children's best interests.

[16] On June 11, 2020, the trial court entered its detailed Order terminating Mother's parental rights to Children.

[17] Mother now appeals. Additional facts will be provided if necessary.

# DISCUSSION AND DECISION

## A. *Standard of Review*

[18] The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). However, parental rights "are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Id.* If "parents are unable or unwilling to meet their parental responsibilities," termination of parental rights is appropriate. *Id.* We recognize that the termination of a parent-child

relationship is "an 'extreme measure' and should only be utilized as a 'last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed.'" *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015) (quoting *Rowlett v. Vanderburgh Cty. Office of Family & Children*, 841 N.E.2d 615, 623 (Ind. Ct. App. 2006)).

[19] Indiana courts rely on a "deferential standard of review in cases concerning the termination of parental rights" due to the trial court's "unique position to assess the evidence." *In re A.K.*, 924 N.E.2d 212, 219 (Ind. Ct. App. 2010), *trans. dismissed*. Our court neither reweighs evidence nor assesses the credibility of witnesses. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We consider only the evidence and any reasonable inferences that support the trial court's judgment, and we accord deference to the trial court's "opportunity to judge the credibility of the witnesses firsthand." *Id.*

### B. *Termination of Parental Rights Statute*

[20] In order to terminate a parent's rights to his or her child, DCS must prove:

> (A) that one (1) of the following is true:
>
> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> * * * *
> (iii) The child has been removed from the parent and has been under the supervision of a local office . . . for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a [CHINS] . . . ;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS];

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each of the foregoing elements by clear and convincing evidence. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014). "[C]lear and convincing evidence requires the existence of a fact to be highly probable." *Id.*

[21] Mother's main claim focuses on the allegation that there is insufficient evidence to support the trial court's determination that the conditions which resulted in the removal of the Children have not been remedied.[2] It is well established that "[a] trial court must judge a parent's fitness as of the time of the termination

---

[2] Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive; therefore, DCS is required to prove only one of three listed elements. *See In re A.K.*, 924 N.E.2d at 220-21.

hearing and take into consideration evidence of changed conditions." *Stone v. Daviess Cty. Div. of Children & Family Servs.*, 656 N.E.2d 824, 828 (Ind. Ct. App. 1995), *trans. denied*. In judging fitness, a trial court may properly consider, among other things, a parent's substance abuse and lack of adequate housing and employment. *McBride v. Monroe Co. OFC*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). The trial court may also consider a parent's failure to respond to services. *Lang v. Starke Co. OFC*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. "[H]abitual patterns of conduct must be evaluated to determine whether there is a substantial probability of future neglect or deprivation." *Stone*, 656 N.E.2d at 828. A trial court "need not wait until the children are irreversibly influenced by their deficient lifestyle such that their physical, mental and social growth is permanently impaired before terminating the parent-child relationship." *Id*. Furthermore, "[c]lear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *K.T.K.*, 989 N.E.2d at 1230.

[22] DCS first became involved after Mother and Father engaged in domestic violence in front of their child in March 2018. Mother claims that she no longer lives with Father, and "any issues of domestic violence, were therefore, resolved." (Appellant's Br. p. 19). Even if we were to accept that Mother's argument is true, there were other issues that resulted in the placement of Children outside Mother's home, namely Mother's substance abuse issues,

unstable housing, and employment, have not been addressed. *See In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005) ("it is not just the basis for the initial removal that may be considered . . . but also those bases resulting in the continued placement outside of the home"), *trans. denied*.

[23] Prior to the inception of this CHINS case, Mother had been abusing substances such as methamphetamine, alcohol, and marijuana for years. The trial court ordered Mother to participate in a number of services to address her substance abuse, housing instability, and unemployment, but she did not consistently engage in those services or benefit from them when she did engage. For instance, in August 2018, Mother completed an inpatient twenty-one-day residential substance abuse treatment program at Winchester house, but she never progressed to other phases of her treatment and was unsuccessfully discharged in October 2018. While Mother would have had the opportunity to reenter the substance abuse program, she did not do so.

[24] Evidence at the termination hearing showed that despite being offered numerous treatment programs and other opportunities to address her substance abuse addiction, Mother continued to use drugs throughout these proceedings. Mother was only able to maintain sobriety for about a month or one and a half months at a time. On March 21, June 27, July 18, August 29, September 17, and 29, and November 22, 2019, Mother tested positive for either methamphetamine, THC, or alcohol. Although Mother had enrolled in AA and NA meetings in December 2019 while the termination of her parental rights proceeding was ongoing, a court is free not to give more weight to a

parent's last-ditch remedial effort. *See In re J.S.,* 133 N.E.3d 707, 715 (Ind. Ct. App. 2019) ("The trial court has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior.") (internal citation and quotation omitted).

[25] Further, the record reflects that at the time of the termination hearing, Mother lived in a motel in Muncie with her boyfriend who was on house arrest, and FCM Winans opined that the motel was not a safe place for Children. Mother was also unemployed with the date of her last employment being 2018.

[26] Although it is apparent from the record that Mother loves her children and was compliant with some of the services offered by DCS, she did not make progress in the services that matter most: those that will help her overcome her drug addiction and remain sober to parent Children. Thus, we hold that the trial court's determination that there is a reasonable probability that the conditions that resulted in Children's removal or the reasons for their placement outside Mother's home will not be remedied is supported by clear and convincing evidence.

## CONCLUSION

[27] Based on the foregoing, we hold that the trial court did not clearly err in determining that there was sufficient evidence to support the termination of the Mother's parental rights.

Affirmed.

Najam, J. and Crone, J. concur